# IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| GREG BOSTARD, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: 1:23-CV-08564 |
| v. | |
| VERIZON COMMUNICATIONS INC. and VERIZON NEW JERSEY, INC., | ORAL ARGUMENT REQUESTED |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

Bridget K. O'Connor
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 200001
Telephone: +1.202.879.3939
Facsimile:  +1.202.626.8585

Leon F. DeJulius Jr.
Sharyl A. Reisman
Jennifer L. Del Medico
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: +1.212.326.3939
Facsimile:  +1.212.755.7306

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND .................................................................................4

I.     REGULATION OF UTILITY POLE ACCESS AND RELATED WORK...............................................................................4

II.    PLAINTIFF'S ALLEGATIONS. ....................................................6

ARGUMENT .....................................................................................9

I.     THE NEGLIGENCE CLAIM IN COUNT 1 FAILS AS A MATTER OF LAW...............................................................................9

    A.  Plaintiff lacks Article III standing. ........................................9

    B.  As a matter of law, Defendants did not owe a duty to Plaintiff. ..............13

    C.  Plaintiff fails to state a claim for medical monitoring. .............................15

II.    THE NEGLIGENCE PER SE CLAIM FAILS AS A MATTER OF LAW...............................................................................19

    A.  Plaintiff also lacks standing for Count 2....................................19

    B.  As a matter of law, RCRA cannot support a negligence per se claim...............................................................................20

III.   THE PUBLIC NUISANCE CLAIM IN COUNT 3 FAILS AS A MATTER OF LAW. ........................................................24

    A.  Plaintiff cannot allege the necessary "special injury." .............................25

    B.  The Complaint fails to allege interference with a common right............27

IV.   ALL CLAIMS ARE TIME-BARRED. .........................................29

V.    THE COURT SHOULD DISMISS THE CLASS ALLEGATIONS.............33

    A.  Personal injury classes are not appropriate for class treatment and regularly fail at the pleading stage.........................................33

    B.  The Complaint cannot plead the requirements for certification, and no amount of discovery can correct those deficiencies. ..........................35

CONCLUSION .................................................................................40

i

# TABLE OF AUTHORITIES

**Page**

CASES

*325-343 E. 56th St. Corp. v. Mobil Oil Corp.*,
906 F. Supp. 669 (D.D.C. 1995)........................................................................21

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997).........................................................................................34

*Amland Properties Corp. v. Aluminum Co. of America*,
711 F. Supp. 784 (D.N.J. 1989)........................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................................16

*Ayers v. Jackson*,
525 A.2d 287 (N.J. 1987) .................................................................................24

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) .................................................................33, 34, 38

*Barnett v. Six Flags Great Adventure*,
2018 WL 2056154 (D.N.J. May 2, 2018).........................................................28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................9

*Bennett v. Quest Diagnostics, Inc.*,
2023 WL 3884117 (D.N.J. June 8, 2023).........................................................33

*Blanyar v. Genova Prod. Inc.*,
861 F.3d 426 (3d Cir. 2017) ......................................................................30, 31

*Boteach v. Socialist People's Libyan Arab Jamahiriya*,
759 F. Supp. 2d 548 (D.N.J. 2010)...................................................................27

ii

# TABLE OF AUTHORITIES
(continued)

**Page**

*Buynie v. Airco, Inc.*,
  2007 WL 2275013 (N.J. App. Div. Aug. 10, 2007) ...........................................19

*Caleb v. CRST, Inc.*,
  43 F. App'x 513 (3d Cir. 2002) ..........................................................................29

*Cashatt v. Ford Motor Co.*,
  2021 WL 1140227 (W.D. Wash. Mar. 24, 2021)........................................35, 38

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) ...............................................................................28

*City of Huntington v. AmerisourceBergen Drug Corp.*,
  609 F. Supp. 3d 408 (S.D.W. Va. 2022)..............................................................28

*City of W. Sacramento v. R & L Bus. Mgmt.*,
  2018 WL 3198118 (E.D. Cal. June 27, 2018) .....................................................22

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).............................................................................................11

*Cordy v. Sherwin Williams Co.*,
  975 F. Supp. 639 (D.N.J. 1997) ..........................................................................22

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2008).............................................................................................19

*Faulhaber v. Petzl Am., Inc.*,
  __ F. Supp. 3d __, 2023 WL 1993612 (D. Colo. 2023) .....................................35

*Finkelman v. NFL*,
  810 F.3d 187 (3d Cir. 2016) .........................................................................10, 12

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) ...................................................33, 34, 37, 38, 39

iii

## TABLE OF AUTHORITIES
(continued)

**Page**

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982)...............................................................................35

*Goasdone v. Am. Cyanamid Corp.*,
  808 A.2d 159 (N.J. Super. 2002) ...................................................34, 38

*Green v. 712 Broadway, LLC*,
  2018 WL 2754075 (D.N.J. June 8, 2018).........................................22

*Hackensack Riverkeeper, Inc. v. Del. Otsego Corp.*,
  2007 WL 1147048 (D.N.J. Apr. 17, 2007).......................................23

*Haddonbrook Assocs. v. GE*,
  427 F. App'x 99 (3d Cir. 2011) ..................................................29, 33

*Harris v. Advance Process Supply, Co.*,
  2009 WL 1789545 (N.J. App. Div. June 25, 2009)..........................29

*Huertas v. Bayer U.S., LLC*,
  2023 WL 3773139 (D.N.J. May 23, 2023).......................................10

*In re Lead Paint Litig.*,
  924 A.2d 484 (N.J. 2007) ...................................................25, 28, 29

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
  193 F.3d 781 (3d Cir. 1999) ...........................................................20

*In re Paulsboro Derailment Cases*,
  746 F. App'x 94 (3d Cir. 2018) .......................................................19

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*,
  208 F.R.D. 625 (W.D. Wash. 2002) ................................................35

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005) ........................................................34

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*In re TVA Ash Spill Litig.*,
    2012 WL 3647704 (E.D. Tenn., Aug. 23, 2021) ................................................24

*Jones v. BRG Sports, Inc.*,
    2019 WL 3554374 (N.D. Ill. Aug. 1, 2019) .......................................................39

*Kimca v. Sprout Foods, Inc.*,
    2022 WL 1213488 (D.N.J. Apr. 25, 2022).........................................................10

*Koronthaly v. L'Oreal USA, Inc.*,
    2008 WL 2938045 (D.N.J. July 29, 2008) ........................................................10

*Labega v. Joshi*,
    270 A.3d 378 (N.J. App. Div. 2022) .................................................................21

*Lafferty v. Sherwin-Williams Co.*,
    2018 WL 3993448 (D.N.J. Aug. 21, 2018) .............................4, 16-19, 33, 35-37

*LAJIM, LLC v. GE*,
    917 F.3d 933 (7th Cir. 2019) .............................................................................23

*Liberty Bell Temple III v. Trenton City Police Dep't*,
    2019 WL 4750836 (D.N.J. Sept. 30, 2019).......................................................21

*Living Lands, LLC v. Cline*,
    __ F. Supp. 3d __, 2023 WL 2142981 (S.D. W. Va. Feb. 21, 2023) ................23

*Lockhart v. Dorrance Publ'g Co., Inc.*,
    2023 WL 157323 (D.N.J. Jan. 11, 2023).................................................... 30-32

*Lutz v. Portfolio Recovery Assocs., LLC*,
    49 F.4th 323 (3d Cir. 2022) ................................................................................9

*Magnum LTL, Inc. v. CIT Grp./Bus. Credit, Inc.*,
    2009 WL 1025550 (D.N.J. Apr. 16, 2009).......................................................14

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Mathews v. Univ. Loft Co.*,
903 A.2d 1120 (N.J. App. Div. 2006) ................................................................. 14

*Mauro v. Raymark Indus.*,
561 A.2d 257 (N.J. 1989) ................................................................................... 24

*Meghrig v. KFC W.*,
516 U.S. 479 (1996) ........................................................................................... 21

*Missud v. Oakland Coliseum Joint Venture*,
2013 WL 812428 (N.D. Cal. Mar. 5, 2013) ........................................................ 20

*MSP Recovery Claims, Series LLC and Series 17-04-631 v. Plymouth Rock Assurance Corp., Inc.*,
404 F. Supp. 3d 470 (D. Mass. 2019) ......................................................... 34, 36

*PECO v. Hercules, Inc.*,
762 F.2d 303 (3d Cir. 1985) ....................................................................... 25, 26

*Ries v. Amtrak*,
960 F.2d 1156 (3d Cir. 1992) ............................................................................. 21

*Rigatti v. Reddy*,
723 A.2d 1283 (N.J. App. Div. 1999) ........................................................... 14, 15

*Russomanno v. Sunovion Pharms.*,
2020 WL 2520761 (D.N.J. May 18, 2020) ......................................................... 13

*Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*,
2013 WL 5655480 (E.D. Pa. Oct. 17, 2013) ......................................... 16, 17, 18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........................................................................................... 12

*State ex rel. Hunter v. Johnson & Johnson*,
499 P.3d 719 (Okla. 2021) ................................................................................. 28

# TABLE OF AUTHORITIES
(continued)

**Page**

*State v. Lead Indus., Ass'n, Inc.*,
  951 A.2d 428 (R.I. 2008) ..................................................................................28

*Stewart Title Guar. Co. v. L. Offs. of David Fleischmann*,
  2023 WL 3168320 (D.N.J. Apr. 28, 2023) ..................................................13, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................................................8

*Theer v. Philip Carey Co.*,
  628 A.2d 724 (N.J. 1993) ...................................................................................15

*Tighe v. Peterson*,
  814 A.2d 1066 (N.J. 2002) .................................................................................14

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ....................................................................................9, 11

*Wademan v. Concra*,
  13 F. Supp. 2d 295 (N.D.N.Y 1998) ........................................................20, 21, 24

**STATUTES**

42 U.S.C. § 6972 ..............................................................................................21, 22

47 U.S.C. § 224 ......................................................................................................4

N.J. Stat. § 2A:14-1 ............................................................................................3, 29

N.J. Stat. § 2A:14-2 ............................................................................................3, 29

N.J. Stat. § 2C:17-3 ................................................................................................4

N.J. Stat. § 2C:18-1 ................................................................................................4

# TABLE OF AUTHORITIES
### (continued)

**Page**

**OTHER AUTHORITIES**

29 C.F.R. § 1910.268 ............................................................5, 7, 13, 15, 30

29 C.F.R. § 1910.1025 ........................................................5, 6, 7, 13, 15, 30

43 Fed. Reg. 52952 .................................................................................6

46 Fed. Reg. 6134 ..................................................................................6

Fed. R. Civ. P. 9 ....................................................................................32

Fed. R. Civ. P. 12 ...................................................................4, 9, 29, 33

Fed. R. Civ. P. 23 .......................................................................4, 33, 35

Restatement (Second) of Torts § 821B.......................................27, 28, 29

Restatement (Second) of Torts § 821C.......................................25, 26, 27

## **INTRODUCTION**

In July 2023, *The Wall Street Journal* incited concerns about a supposedly widespread "hidden source of contamination"—namely, telecommunications cables from as early as the 1800s that used lead to cover and protect copper wiring from corrosion.  Funded by outside, self-interested advocacy groups, and using unreliable testing methods, WSJ cited test data from a handful of sites to proclaim that telecom cables are spreading lead "where Americans live, work and play."[1]

Riding on the coattails of *The Wall Street Journal*'s poorly supported claims, Plaintiff filed this lawsuit.  There is no merit to his allegations.  Plaintiff asserts that he spent decades as a trained utility worker with Comcast Corporation ("Comcast"), a nonparty.  In that capacity, Plaintiff allegedly climbed utility poles, worked around lead-sheathed cables, and was regularly in close proximity to lead.  But despite his lengthy career, he does not allege that lead has ever been detected in his body or that he has ever suffered any lead-related harm.  The Complaint also cannot account for

---

[1]   *See*   https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b. Independent investigation revealed that the advocacy group Environmental Defense Fund helped fund WSJ's work, while paid witnesses appearing against telecom companies in pending environmental lawsuits performed the testing.  *See New York Law Journal*, "The Wall Street Journal Investigative Series on Lead Cables: A Surprising Swing and Miss, and a Cautionary Tale for the Plaintiffs' Bar," Sept. 17, 2023, *available at* https://www.law.com/newyorklawjournal/2023/09/17/the-wall-street-journal-investigative-series-on-lead-cables-a-surprising-swing-and-miss-and-a-cautionary-tale-for-the-plaintiffs-bar/.

why Plaintiff waited decades to file suit over a well-known occupational circumstance for which he was entitled to safety training from Comcast. Lawsuits cannot proceed on the basis of irrational fears stoked by dubious journalism. They must be built from essential elements like injury, standing, and timeliness—requirements that Plaintiff cannot satisfy here.

Each claim in the Complaint fails as a matter of law. ***First***, the Complaint fails to state a claim for negligence in Count 1. Despite his lengthy career, Plaintiff does not claim that lead was ever detected in his body, at an elevated level or otherwise, and cannot allege the elements necessary to plead Article III standing. Plaintiff also cannot allege that Verizon had a duty to protect him from lead-sheathed cables.[2] In fact, federal law imposes on Plaintiff's own employer—nonparty Comcast—the duty to protect him from workplace hazards, including lead exposure. Plaintiff cannot summarily shift that duty to Verizon. Plaintiff also fails to allege any basis for ordering Verizon to fund ongoing medical monitoring. His general concern about one day presenting any one of innumerable, nonspecific medical conditions is too broad to support a remedy only available in specific circumstance, and only to help meaningfully avoid particularized types of harm.

---

[2] For convenience, Defendants are collectively referred to herein as "Verizon," but they are distinct entities and not similarly situated for purposes of the alleged claims. Verizon Communications Inc. and Verizon New Jersey, Inc., each reserve all arguments that it is not properly named as a Defendant.

***Second***, the negligence per se claim in Count 2 fails as a matter of law, including for lack of standing.  It makes no difference that the Complaint purports to allege a violation of the federal Resource Conservation and Recovery Act ("RCRA").  An alleged RCRA violation does not confer standing on a private citizen, and in any event, allowing Plaintiff to circumvent the statutory scheme that Congress designed by recasting a RCRA claim as a stand-alone negligence per se claim under state law would contradict Third Circuit and New Jersey precedent.

***Third***, Plaintiff cannot pursue the public nuisance claim in Count 3 because he only alleges exposure to lead-sheathed cables through direct contact in an occupational capacity, and does not identify any special injury.  Under New Jersey nuisance principles, that deprives him of the standing necessary for any private citizen to assert a public nuisance claim.  The Complaint's general invocation of health and safety is also insufficient to allege the element of "public right" and cannot be dressed up in the guise of public nuisance.

***Fourth***, all claims are barred under the governing statutes of limitations, which are two years for any alleged personal injury, and no more than six years for any other form of relief.  *See* N.J. Stat. §§ 2A:14-1, 2A:14-2.  Federal workplace laws began regulating utility workers and occupational lead exposure in the 1970s.  By that same time—as the Complaint itself demonstrates—scientists and unions were reporting on the hazards of lead-sheathed cables.  Plaintiff was a utility worker

3

for decades, and was on notice of his potential claims throughout that time.  He waited too long to file suit, and his claims are now time-barred.

*Finally*, Plaintiff cannot plead any class claim under Fed. R. Civ. P. 23. Claims for class-wide medical monitoring that implicate too many individualized circumstances are irreconcilable with the requirements for class treatment and should be dismissed on the pleadings.  Nothing about this case warrants—or meets the precatory thresholds for—utilizing the special procedures of Rule 23 for adjudicating claims on behalf of absent putative class members.  *See, e.g.*, *Lafferty v. Sherwin-Williams Co.*, 2018 WL 3993448, at *5-6 (D.N.J. Aug. 21, 2018) (dismissing class allegations under Rule 12(b)(6)).

For each of these reasons, the Complaint should be dismissed.

## **BACKGROUND**

### I.    **Regulation of Utility Pole Access and Related Work.**

Utility poles are regulated components of essential telecom infrastructure, and access to the cables they support is highly restricted.  Criminal statutes and special trespass rules prohibit members of the public from accessing or tampering with poles. *See, e.g.*, N.J. Stat. §§ 2C:17-3, 2C:18-1.  Federal law does, however, grant cable television companies and other carriers a right of "nondiscriminatory access" to the poles for attaching aerial equipment.  47 U.S.C. § 224(f).  Thus, Verizon cannot

simply block cable television providers like Comcast from accessing utility poles to install and maintain their own broadcast equipment.

Accordingly, federal law also obligates Comcast and other cable providers to appropriately protect the workers they send up those poles. The Occupational Safety and Health Administration ("OSHA") has promulgated at least two sets of regulations that comprehensively require workplace safety in this environment. *See* 29 C.F.R. §§ 1910.268 and 1910.1025(a). Section 1910.268 "sets forth safety and health standards that apply to the work conditions … performed … at telecommunications field installations," including "the installation, operation, [and] maintenance … [of] equipment used for signal or communication service." 29 C.F.R. § 1910.268(a)(1). Among other things, Section 1910.268 requires that the worker's "employer" provide tools and protective equipment needed for the work, which may include insulated clothing, climbing gear, and eye protection. *Id.* § 1910.268(e). The "employer" must also train its employees on applicable precautions and practices, including the "[r]ecognition and avoidance of dangers relating to encounters with harmful substances." *Id.* § 1910.268(c)(1).

Section 1910.1025 separately addresses "occupational exposure to lead." 29 C.F.R. § 1910.1025(a)(1). That rule imposes broad obligations on a worker's "employer" to monitor lead exposure. *Id.* § 1910.1025(d). Where an employee faces potential exposure to lead, his or her "employer" must provide training and

5

information about substance identification and exposure limits. *Id.* § 1910.1025(l)(1)(i)-(ii). If exposure exceeds action levels and permissible exposure limits, the worker's "employer" must take additional precautions, including personal protective equipment and medical screening. *Id.* § 1910.1025(e), (j). This rule also prohibits the consumption of food or beverages in areas where employees are exposed to heightened lead levels and requires that the "employer" ensure that any of its employees exposed to heightened lead levels wash their hands and face before eating. *Id.* § 1910.1025(i)(4).

## II.   Plaintiff's Allegations.

As the Complaint recognizes, as early as 1978, the Communications Workers of America—the union that represents communications workers like Plaintiff—was aware that "cable splicers may be exposed to a lead hazard." Compl. ¶ 59. So were third-party researchers, as shown in "numerous studies over the past 50 years." *Id.* ¶ 6; *see also id*. ¶ 51. Indeed, OHSA workplace regulations with respect to utility-pole work and workplace lead exposure have existed since at least 1978. 43 Fed. Reg. 52952 (Nov. 14, 1978) (rule-making for occupational exposure to lead); 46 Fed. Reg. 6134 (Jan. 21, 1981) (stating supplemental reasons for limitations on workplace lead exposure and discussing use of lead-sheathed telecom cables).

Plaintiff is a former utility worker, but was neither an employee nor contractor of Verizon. Instead, between 1990 and 2019 he worked for nonparty Comcast.

Compl. ¶ 15.  Comcast is subject to OHSA's workplace regulations, including Sections 1910.268 and 1910.1025.  *See, e.g.*, OSHA Inspection: 1028050.015 (imposing penalties on Comcast of New Jersey for violations of Section 1910.268).[3]

In his capacity as a Comcast employee, Plaintiff allegedly climbed utility poles to service Comcast aerial cables.  Compl. ¶ 15.  According to the Complaint, those utility poles also supported lead-sheathed cables laid "between the late 1800s and the 1960s" by the American Telephone & Telegraph Company ("AT&T").  *Id.* ¶ 3.  Plaintiff claims that as lead-sheathed cables placed decades ago degrade, they expose lead.  *Id.* ¶ 6.  Alleging that his job necessitated incidental contact with the lead-sheathed cables—such as brushing up against the cables with his clothes or directly handling the cables and then using his hands to eat lunch or wipe his face— Plaintiff claims he was thereby exposed to lead, and this exposure has increased his "risk of developing lead-related health conditions."  *Id.* ¶¶ 8-9, 15.

As the materials Plaintiff filed with the Complaint demonstrate, any alleged exposure to lead could have resulted from activities well outside Plaintiff's professional duties as a Comcast employee.  Lead is a naturally occurring chemical element found in the earth's crust.[4]  Historically, it has also had commercial uses,

---

[3] Available at https://www.osha.gov/ords/imis/establishment.inspection_detail?id=1028050.015.

[4] Center for Disease Control, *National Biomonitoring Program Factsheet* (July 12, 2013) ("CDC Factsheet"), *available at* https://www.cdc.gov/biomonitoring/lead_factsheet.html.  The CDC Factsheet is

including as an additive in gasoline, and in the manufacture of water pipes and cookware. *See* CDC Factsheet. Indeed, water from leaded pipes and food are two of the main sources of lead exposure, and lead is still commonly found in everyday products, including baby food, juice, and vegetables.[5]

Whatever the source, lead is allegedly correlated with a broad array of health risks. The Complaint alleges that lead can cause various generally stated conditions, from "headaches" and "mood changes" to "neurological problems." Compl. ¶¶ 30-32. Plaintiff, however, does not claim to have suffered any of these conditions. Nor does he claim that lead from any source was ever detected in his body, that lead from any Verizon cable is currently present in his blood (much less at levels above general population averages), or that he has ever presented a lead-related symptom. Plaintiff also does not allege that he will work with lead-sheathed cables in the future. *See id*. ¶ 15. He nevertheless seeks relief in the form of "(1) medical monitoring to permit early detection of future lead-related conditions, and (2) abatement to remove

referenced in, and incorporated into, the pleadings and may be considered in considering a motion to dismiss. Compl. ¶ 36 n.4; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[5] World Health Organization, *Lead Poisoning and Health* (August 23, 2019), and Welch, Teresa, *Lead Found in 20% of Baby Food, Report Says* (June 19, 2017), both incorporated into the pleadings. *See* Compl. ¶ 36 nn.2-3; *see also Tellabs*, 551 U.S. at 322.

and properly dispose of the lead-sheathed cables in New Jersey and surrounding lead contamination."  Compl. ¶ 10.

## ARGUMENT

A complaint should be dismissed under Fed. R. Civ. P. 12 if it fails to plead sufficient facts to state a claim to relief that is plausible on its face, or if the claims are otherwise precluded as a matter of law.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To state a claim that survives a motion to dismiss under Rule 12(b)(6), a complaint must present more than mere "suspicion" and "legal conclusions" with a "formulaic recitation of the elements of" the claim.  *Id.* at 555, 564 (citations omitted).  It must rest on "factual allegations" that plausibly "raise a right to relief above the speculative level."  *Id.* at 545.  Where a pleading does not meet this standard, it must be dismissed.  *See generally id.*; *see also Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323 (3d Cir. 2022).

## I.      The Negligence Claim in Count 1 Fails as a Matter of Law.

### A.      Plaintiff lacks Article III standing.

Plaintiff's negligence claim first fails because he has not alleged Article III standing, without which there is no constitutional "Case" or "Controversy" to confer jurisdiction.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 2207 (2021). Plaintiff, as the party bringing suit, has the burden of pleading three elements to demonstrate standing: "(i) that he suffered an injury in fact that is concrete,

particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 2203. Conclusory allegations cannot satisfy Plaintiff's burden. *Finkelman v. NFL*, 810 F.3d 187, 194 n.55 (3d Cir. 2016) ("[S]tanding cannot rest on mere 'legal conclusions' or 'naked assertions.'").

These gatekeeping requirements have barred similar actions that—like this one—allege exposure to a toxin. "[M]ere exposure to lead-containing lipstick and [an] increased risk of being poisoned by lead," for instance, could not establish standing. *Koronthaly v. L'Oreal USA, Inc.*, 2008 WL 2938045, at *1 (D.N.J. July 29, 2008), *aff'd*, 374 F. App'x 257 (3d Cir. 2010). Similarly, an unsubstantiated "risk of physical injury from exposure to benzene" in skin products could not establish standing for a medical monitoring claim. *Huertas v. Bayer U.S., LLC*, 2023 WL 3773139 (D.N.J. May 23, 2023), *on appeal* No. 23-2178 (3d Cir.); *see also Kimca v. Sprout Foods, Inc.*, 2022 WL 1213488, at *5-6 (D.N.J. Apr. 25, 2022) (holding that allegations of unsafe levels of heavy metals in baby food did not establish standing). The mere exposure to a toxic substance is not a concrete injury.

Count 1 fails to allege the required concrete injury. Plaintiff alleges occupational exposure to lead-sheathed cables, but does not allege that lead ever made its way into his body and caused him harm. He does not claim that lead is, or ever was, detected in his blood. He does not even claim that he has ever taken a

blood-lead test.  The lack of any allegation that lead from any source—let alone lead from a Verizon cable—was ever in Plaintiff's body demonstrates the lack of any corresponding, concrete injury for Article III standing purposes.

Nor does Plaintiff allege any other physical harm.  Despite a 29-year career as a utility worker and unquantified but allegedly "direct" contact with lead-sheathed cables, Plaintiff does not claim that he currently suffers, or has ever suffered from a condition caused by lead exposure.  The Complaint merely alleges that Plaintiff has been in the presence of a toxin, and nothing more.  If that kind of mere exposure to lead—which is, after all, present in the environment naturally—were sufficient to establish standing, the line to the courthouse door would stretch beyond sight.  That is not, and cannot be, the law, and Count 1 should be dismissed.

Allegations about the *risk* of developing a condition associated with lead exposure do not save the claim.  Rather, to confer standing, a risk of future harm must be "sufficiently imminent and substantial," *TransUnion*, 141 S. Ct. at 2210, or "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Nothing in the Complaint constitutes such an allegation, however.  Even accepting Plaintiff's allegation that lead-related conditions may sometimes manifest years after exposure, Compl. ¶ 45, the Complaint does not justify inferring that such conditions are "certainly impending" or "imminent" *for Plaintiff*, particularly since Plaintiff alleges exposure to lead starting decades ago.  Speculation and conjecture are the

11

only way to conclude that Plaintiff—a veteran utility worker who has not worked with lead-sheathed cables since 2019—might in the future have a lead injury from a Verizon cable.  That kind of "conjectural or hypothetical" claim does not create standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 399 (2016) (citation omitted).

Plaintiff also fails to plead traceability and redressability.  The lack of any concrete injury, the presence of lead in myriad other everyday sources, and the admitted existence of non-Verizon lead-sheathed cables necessarily means there is nothing traceable to Defendants specifically.  Compl. ¶¶ 25, 29, 38; *see also* CDC Factsheet.  While Plaintiff fails to allege any actual harm, even had he done so, the relief sought here—abatement and medical monitoring—could not redress any alleged harm.  Abatement of lead-sheathed cables is meaningless to Plaintiff, who is a ***former*** utility worker under no threat of ***future*** contact with lead-sheathed cables. Similarly, medical monitoring would neither reduce any lead already in Plaintiff's blood, nor prevent any future exposure to lead from any source.  Plaintiff offers the generic assertion that monitoring would "permit the earliest possible diagnosis of illnesses, which could lead to improved outcomes," Compl. ¶ 71, but that is far too conclusory and speculative for federal pleading purposes.  *Finkelman*, 810 F.3d at 194 n.55.  There are no factual allegations to substantiate the assertion that medical monitoring and early detection might redress any injury if Plaintiff were to develop

a lead-related condition sometime in the future.  This failure to allege each element of standing compels dismissing Count 1.

### B.     As a matter of law, Defendants did not owe a duty to Plaintiff.

Count 1 fails for the independent reason that Verizon does not owe Plaintiff a duty.  A "threshold inquiry" in any negligence action is "whether the defendant owed the plaintiff a duty of care." *Stewart Title Guar. Co. v. L. Offs. of David Fleischmann*, 2023 WL 3168320, at *3 (D.N.J. Apr. 28, 2023) (quoting *Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010)).  This "determination of whether a duty of care exists is quintessentially a question of law for the court." *Id*. (citation omitted).

Comcast, as Plaintiff's alleged "employer," had the duty under federal law to protect Plaintiff from occupational hazards.  *See* 29 C.F.R. §§ 1910.268, 1910.1025. That duty requires providing appropriate training and protective equipment, enforcing restrictions on the use of food or beverages to prevent the ingestion of any toxin, and blood sampling.  *See generally id*.  It is expressly the duty of Plaintiff's "employer" (i.e., Comcast, not Verizon) to provide such precautions.  *Id*.

Plaintiff cannot shift that duty to Defendants through a state-law tort claim. In New Jersey, the "duty owed to another is defined by the relationship between the parties." *Russomanno v. Sunovion Pharms.*, 2020 WL 2520761, at *10 (D.N.J. May 18, 2020) (quoting *NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871, 889 (N.J. 2006)). Where a plaintiff alleges "no relationship whatsoever" between the parties, courts

within this district routinely dismiss negligence claims.  *Id*; *see also, e.g.*, *Stewart Title*, 2023 WL 3168320, at *4 (dismissing amended complaint that "allege[d] no relationship at all between Plaintiff and [the defendants]"); *Magnum LTL, Inc. v. CIT Grp./Bus. Credit, Inc.*, 2009 WL 1025550, at *4 (D.N.J. Apr. 16, 2009) (same).

In the occupational context, a defendant can expect that the plaintiff's own employer will provide training on workplace hazards, and that the plaintiff will be sufficiently skilled to recognize and avoid the dangers of his profession.  A landlord, for instance, has no duty to protect a contractor's employee from "operational hazards which are obvious and visible to the invitee upon ordinary observation and which are part of or incidental to the very work the contractor was hired to perform." *Rigatti v. Reddy*, 723 A.2d 1283, 1286 (N.J. App. Div. 1999) (citation omitted). Instead, landowners "may assume that the independent contractor and [its] employees are sufficiently skilled to recognize the dangers associated with their task and adjust their methods accordingly to ensure their own safety."  *Id*. (citation omitted); *see also Tighe v. Peterson*, 814 A.2d 1066, 1067 (N.J. 2002) (no duty where "social guest … is aware of the condition or by reasonable use of the facilities would observe it"); *cf. Mathews v. Univ. Loft Co.*, 903 A.2d 1120, 1124 (N.J. App. Div. 2006) (no duty to warn of open and obvious hazards).

Verizon was entitled to assume that independent companies servicing third-party equipment on utility poles would comply with their own safety obligations.

Those obligations required Comcast to ensure that any employee it sent up the poles would be trained, "sufficiently skilled to recognize the dangers associated with their task," and adequately protected against the dangers "inherent" to their occupation. *Rigatti*, 723 A.2d at 1286 (citation omitted). Regulators, independent researchers, and the union for workers like Plaintiff have known for over 40 years of the potential for exposure to lead, which Plaintiff claims was also sometimes plainly visible on cables. Compl. ¶¶ 6, 51, 55, 59. As the Complaint demonstrates, Plaintiff worked in a highly specialized field and interacted with known, open, and obvious hazards. He also had the benefit of federal law requiring that Comcast provide safety training and protection from lead exposure. 29 C.F.R. §§ 1910.268, 1910.1025. Verizon cannot owe Plaintiff a duty under these circumstances, and Count 1 should be dismissed on that basis as well. *Rigatti*, 723 A.2d at 1286.

### C.    Plaintiff fails to state a claim for medical monitoring.

Count 1 fails as a matter of law for a third, independent reason: Plaintiff cannot adequately plead the elements under New Jersey law for medical monitoring. This "special compensatory remedy" is not "easily invoked." *Theer v. Philip Carey Co.*, 628 A.2d 724, 733 (N.J. 1993). Courts dismiss such claims at the pleading stage where a plaintiff does not sufficiently allege: (a) significant exposure to a proven hazardous substance that can cause serious latent disease; (b) a distinctive increased risk of that disease due to exposure; (c) value in early diagnosis of this disease; and

15

(d) that medical monitoring is reasonable, necessary, and different than any other medical monitoring the plaintiff would otherwise undergo. *See id.*; *see also, e.g.*, *Lafferty v. Sherwin-Williams Co.*, 2018 WL 3993448, at *5 (D.N.J. Aug. 21, 2018) (dismissing medical monitoring claim); *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 2013 WL 5655480 (E.D. Pa. Oct. 17, 2013) (same).  Plaintiff cannot allege those elements here.

***First***, the Complaint fails to allege "significant" exposure to lead.  Plaintiff claims only that he had "direct and regular exposure to Verizon's lead-sheathed cables." Compl. ¶ 15.  But neither "direct" nor "regular" exposure to lead-sheathed ***cables*** equates with "substantial" exposure to ***lead***, and Plaintiff fails to "show" the latter through the "well-pleaded facts" necessary to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).  Plaintiff does not allege, for instance, how often he climbed utility poles; how many of the utility poles he climbed were allegedly Verizon's; how many Verizon lead-sheathed cables "degrade[d]" to the point that it was "leach[ing]" lead; or even his own blood-lead level at any point in time.  Compl. ¶ 6.  Plaintiff does not adequately allege significant exposure to lead when the pleadings, even if accepted as true, do nothing to substantiate how often or at what levels he was exposed to lead. *Lafferty*, 2018 WL 3993448, at *5 (dismissing complaint where plaintiff fails to "identify … at what levels Plaintiffs were actually exposed").

*Second*, Plaintiff does not allege that he is at a distinctive increased risk of a serious latent disease due to exposure to lead-sheathed cables.  Medical monitoring claims are not meant to address the alleged risk of any possible malady—something that ordinary care already monitors.  Medical monitoring claims are meant to address specific serious diseases uniquely associated with particular toxins.  Courts thus dismiss at the pleading stage medical monitoring claims that, for instance, fail to identify "which lung diseases" among "a host of different diseases" allegedly require monitoring.  *Slemmer*, 2013 WL 5655480, at *3; *see also Lafferty*, 2018 WL 3993448, at *5 (dismissing complaint where plaintiff alleged "numerous potential health hazards presented by lead" but failed to identify "which diseases Plaintiffs are at an increased risk of developing").

Plaintiff's kitchen-sink approach in the Complaint is the opposite of what New Jersey law requires to state a medical monitoring claim.  The Complaint generally alleges that lead "can cause" practically every category of non-specific ailment and symptom, from "mood changes" and "constipation" to general "neurological problems" and "decreased cognitive function."  Compl. ¶¶ 30-32.  Such "vague catch-all phrases" fail to allege a "serious latent disease" susceptible to additional, specialized monitoring, *Slemmer*, 2013 WL 5655480, at *3, and do not even meet the basic due process requirement of "properly put[ting] a defendant on notice of what the claim is or the grounds on which it rests," *Lafferty*, 2018 WL 3993448, at

*4.  There is no practical way to litigate a case for medical monitoring that sweeps in dozens of generalized medical conditions with innumerable pathologies that also happen to allegedly correlate with lead.  And, having failed to allege any specific serious disease, Plaintiff cannot allege that his risk of that disease is substantially increased because of his exposure to Verizon lead-sheathed cables.  Each of those omissions separately precludes any claim for medical monitoring.

*Third*, Plaintiff fails to allege that medical monitoring would be "reasonable," "necessary," and provide "value in early diagnosis" beyond what ordinary care already provides.  The Complaint offers only a "formulaic recitation of the[se] elements," which is not enough to state a claim.  *Slemmer*, 2013 WL 5655480, at *4 (citation omitted); *see also* Compl. ¶¶ 111-13.  Plaintiff also does not identify what "types" of monitoring exist for the early detection of the dozens of conditions enumerated in the Complaint, let alone how that monitoring would be "any different from" the care performed "through routine medical checkups."  *Slemmer*, 2013 WL 5655480, at *3; *see also Lafferty*, 2018 WL 3993448, at *5.  As the Complaint describes, tests for lead levels in patients' blood or bones do not detect the likelihood of health effects from lead, much less any diagnosable diseases.  Compl. ¶¶ 43-47.

Nor does Plaintiff allege how any unidentified monitoring regime for an unidentified disease would be valuable.  To state a claim for the compensatory remedy of medical monitoring, the Complaint must "identify" a "medical

monitoring program" that "would detect" a specific condition early enough to provide additional value in the treatment of that condition—i.e., "actually protect" Plaintiff from harm. *Lafferty*, 2018 WL 3993448, at *5. Plaintiff does not and cannot satisfy that pleading requirement, and never alleges that early detection of any lead-related condition would help to improve prognoses or otherwise have a beneficial change in the course of treatment. It is "inherently inconsistent to recommend medical monitoring in situations where there are no real good tests to establish that someone's going to come down with one of these … illnesses," *In re Paulsboro Derailment Cases*, 746 F. App'x 94, 100 (3d Cir. 2018) (cleaned up), or where "early detection is not likely to alter the outcome," *Buynie v. Airco, Inc.*, 2007 WL 2275013, at *7 (N.J. App. Div. Aug. 10, 2007). For each of these reasons, Plaintiff fails to state a medical monitoring claim.

## II. The Negligence Per Se Claim Fails as a Matter of Law.

### A. Plaintiff also lacks standing for Count 2.

The lack of Article III standing also compels dismissing Count 2. Plaintiff "must demonstrate standing for each claim he seeks to press" and "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2008). Here as well, the Complaint fails to plausibly allege that Plaintiff suffered a concrete injury traceable to Verizon, that abatement and medical monitoring would in any way redress his past exposure to lead-sheathed cables, that he will work with

lead-sheathed cables in the future, or that he will otherwise be exposed to lead from such cables.  *See supra* § I.A.

It makes no difference for standing purposes that the Complaint tries to bootstrap a statutory violation into a negligence per se claim.  Compl. ¶¶ 118-23.  A RCRA violation is not by itself an injury for purposes of Article III standing.  *See, e.g.*, *Missud v. Oakland Coliseum Joint Venture*, 2013 WL 812428, at *16 (N.D. Cal. Mar. 5, 2013).  Courts thus lack jurisdiction to consider alleged RCRA violations under the same Article III principles that preclude any negligence claim, including where the plaintiff has not "suffered any injury in fact as a result of the putative RCRA violation," *id.*, and where "any remedial action … would not effect [sic] or assist the plaintiffs," *Wademan v. Concra*, 13 F. Supp. 2d 295, 305 (N.D.N.Y 1998).  Count 2 should be dismissed for that reason alone.

**B.** **As a matter of law, RCRA cannot support a negligence per se claim.**

Count 2 separately fails as a matter of law for trying to circumvent the legislative scheme for enforcing RCRA.  The Complaint purports to state at Count 2 an independent, stand-alone cause of action that seeks recovery based solely on the alleged violation of RCRA itself.  That is contrary to precedent.  *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 791 (3d Cir. 1999) (negligence per se does not permit a stand-alone negligence per se claim asserting that statutory "violations themselves form a cause of action").  Moreover, negligence

20

per se claims "are virtually non-existent" in New Jersey, and Plaintiff cannot use the theory when he is not "within the class of persons" the underlying statute "is designed to protect," *Labega v. Joshi*, 270 A.3d 378, 388-89, 391 n.11 (N.J. App. Div. 2022), or when the claim would "upset the Congressional scheme for enforcing" the statute. *Ries v. Amtrak*, 960 F.2d 1156, 1164 (3d Cir. 1992).

Count 2 goes well beyond the legislative scheme that Congress designed. Plaintiff is not within a class protected by RCRA, which "does not … protect[] a particular class of people." *325-343 E. 56th St. Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669, 688 (D.D.C. 1995). The statute also does not "effectuate the cleanup of toxic waste sites," *Meghrig v. KFC W.*, 516 U.S. 479, 483 (1996), and it prohibits any private cause of action absent at least ninety days prior notice to federal and state regulators, who can consider initiating their own administrative enforcement actions, 42 U.S.C. § 6972(b)(2)(A)-(C). In all events, RCRA bars any claim for private compensatory relief. *Meghrig*, 516 U.S. at 483; *Wademan*, 13 F. Supp. 2d at 305 (dismissing RCRA medical monitoring claim).

Plaintiff does not allege compliance with RCRA's notice requirements—an omission that by itself demonstrates how the Complaint is improperly using a stand-alone negligence per se claim to "upset the Congressional scheme." *Ries*, 960 F.2d at 1164; *see also Liberty Bell Temple III v. Trenton City Police Dep't*, 2019

WL 4750836, at *25 (D.N.J. Sept. 30, 2019) (dismissing negligence per se claim as contrary to the underlying statute's restriction on private enforcement).[6]

The Complaint also fails to plausibly substantiate that *Verizon* has contributed to an endangerment to health.  Compl. ¶ 120.  Plaintiff seeks the removal of all "lead-sheathed cables in New Jersey and remediation of their environmental impact."  Compl. at 33, ¶ D.  But non-Verizon entities allegedly also maintain lead-sheathed cables, *id*. ¶ 25, and the Complaint provides no factual circumstances around Verizon cables throughout New Jersey, including the nature of the surrounding areas, the condition of the cables, or whether any person has ever experienced elevated blood-lead levels attributable to those cables.   The general allegation that environmental lead levels "near" Verizon cables exceed safety recommendations, *id*., is too vague to allege a RCRA violation seeking state-wide relief.  *City of W. Sacramento v. R & L Bus. Mgmt.*, 2018 WL 3198118, at *4 (E.D. Cal. June 27, 2018) (dismissing for failure to plausibly allege a RCRA violation).

Plaintiff also does not plausibly allege that any lead-sheathed cable—regardless of ownership—presents an "imminent and substantial endangerment."  42 U.S.C. § 6972(a)(1)(B).  An "imminent" endangerment is one that "threaten[s] to

---

[6] *See also Cordy v. Sherwin Williams Co.*, 975 F. Supp. 639, 646 (D.N.J. 1997) (negligence per se claim failed where "plaintiff is not a member of the class of persons who the statute was designed to protect"); *Green v. 712 Broadway, LLC*, 2018 WL 2754075, at *7 (D.N.J. June 8, 2018) (negligence per se claim failed as a matter of law where the underlying statute did not create a private cause of action).

occur immediately." *Hackensack Riverkeeper, Inc. v. Del. Otsego Corp.*, 2007 WL 1147048, at *4 (D.N.J. Apr. 17, 2007) (cleaned up). There is no immediate threat to Plaintiff himself, a ***former*** utility worker who does not allege any future prospect of climbing utility poles. Compl. ¶ 15. Plaintiff's circumstances also show why lead-sheathed cables pose no immediate threat to any other member of the putative class. He worked directly with cables for nearly three decades, but does not claim to have ever had lead in his body or exhibited lead-related symptoms.

The minimal factual allegations in the Complaint are unavailing. Sometimes copying verbatim from WSJ's articles, the Complaint identifies three discrete sites. Compl. ¶¶ 26-28. Only one site—located in another State and thus outside Plaintiff's request for relief—is alleged to have environmental lead that "mirror[s] the lead from" an overhead cable. *Id*. ¶ 27. That is not enough to infer a RCRA violation. "RCRA is not a 'cleanup' statute," *LAJIM, LLC v. GE*, 917 F.3d 933, 949 (7th Cir. 2019), and as courts regularly hold, the "mere presence of contaminants alone, even at high concentrations, does not constitute an imminent and substantial endangerment." *Living Lands, LLC v. Cline*, __ F. Supp. 3d __, 2023 WL 2142981, at *12 (S.D. W. Va. Feb. 21, 2023). Plaintiff cannot use RCRA to bootstrap a negligence per se claim seeking state-wide relief based on the alleged presence of lead in one identified New Jersey location.

At a minimum, Plaintiff cannot rely on RCRA to support his request for medical monitoring. Under New Jersey law, the "use of court-supervised funds to pay medical-surveillance claims as they accrue"—the exact relief Plaintiff seeks here—is an individualized "mechanism for compensating plaintiffs." *Ayers v. Jackson*, 525 A.2d 287, 313 (N.J. 1987); *see also Mauro v. Raymark Indus.*, 561 A.2d 257, 263 (N.J. 1989) ("The cost of medical surveillance is a compensable item of damages." (citation omitted)); Compl. ¶¶ 10, 71-72. RCRA, however, precludes any private cause of action for compensatory damages, including medical monitoring. *Wademan*, 13 F. Supp. 2d at 305 ("RCRA does not create a right for a private citizen to collect damages such as medical monitoring costs."). Plaintiff cannot end-run that prohibition by styling the cause of action in Count 2 as negligence per se. *In re TVA Ash Spill Litig.*, 2012 WL 3647704, at *59 (E.D. Tenn. Aug. 23, 2021) (dismissing negligence per se claim premised on RCRA violation and seeking compensatory relief). Accordingly, Count 2 should be dismissed.

## III.   The Public Nuisance Claim in Count 3 Fails as a Matter of Law.

Count 3 claims that Defendants created a public nuisance because lead from cables allegedly interferes with the public rights to "health, welfare, safety, peace, comfort, and convenience," but that claim fails as a matter of law for two separate reasons. Compl. ¶ 127. Plaintiff cannot allege the "special injury" necessary for

any private individual to assert a public nuisance claim. Moreover, there is no "public right" to health and safety. Each of these deficiencies warrants dismissal.

### A.  Plaintiff cannot allege the necessary "special injury."

Plaintiff does not have standing to allege a public nuisance claim. Such claims allege a "wrong to the entire community" and, therefore, are ordinarily "left to [the community's] duly appointed representatives." Restatement (Second) of Torts § 821C cmt. a; *see also In re Lead Paint Litig.*, 924 A.2d 484, 496 (N.J. 2007) (following the Restatement). Where a private individual seeks to pursue such a claim, he must, therefore, establish standing by pleading a "special injury"—an element designed to "relieve the defendant of the multiplicity of actions that might follow if everyone were free to sue for the common wrong." *Id.*; *see also In re Lead Paint*, 924 A.2d at 498; *PECO v. Hercules, Inc.*, 762 F.2d 303, 315-16 (3d Cir. 1985).

The "special injury" requirement comprises two aspects. Plaintiff must have encountered the nuisance while exercising a right common to the general public, and he must have suffered harm of a different kind from that of other members of the public. *See* Restatement (Second) of Torts § 821C; *see also Hercules*, 762 F.2d at 315-16. The Complaint here fails in both respects.

*First*, a plaintiff cannot allege a "special injury" when he has encountered the alleged nuisance in a uniquely private way unrepresentative of the larger public. In *Hercules*, for instance, the Third Circuit applied Restatement principles to reject the

public nuisance claim by a private landowner alleging that a prior tenant had polluted the Delaware River.  The plaintiff did not claim to actually use the river, but argued that costs incurred remediating its property constituted a special injury.  *Id*. at 316. The Third Circuit held the landowner's claim insufficient because the plaintiff encountered the harm in "the exercise of its private property rights," not in "the exercise of a right common to the general public."  *Id*.; *see also Amland Properties Corp. v. Aluminum Co. of America*, 711 F. Supp. 784 (D.N.J. 1989) (applying *Hercules* to bar a New Jersey public nuisance claim).

That reasoning controls here.  Plaintiff alleges exposure to lead only through direct contact with cables in a specialized occupational role that gave him access to restricted, non-public utility poles.  Compl. ¶ 15.  There is no right common to all members of the general public to climb utility poles and work with those cables. Plaintiff alleges that he encountered the purported nuisance not in the exercise of any common right, but in a unique occupational capacity wholly dissimilar to that of the general public.  For that reason alone, Plaintiff cannot plead a special injury.

**Second**, a plaintiff cannot plead a special injury by claiming "he has suffered the same kind of harm or interference [as the general public] but to a greater extent." Restatement (Second) of Torts § 821C, cmt. b.  Rather, a "private individual can recover … only if he has suffered harm *of a different kind* from that suffered by other persons."  *Id*. (emphasis added).  Someone who uses an obstructed highway

every day, for instance, has suffered an injury greater in degree than someone who uses the highway monthly, but the daily user still cannot plead a public nuisance claim because the injuries are the same in kind. *See id.*

That separately precludes Count 3. The harm that Plaintiff alleges resulted from his direct, occupational contact with cables is the same kind of harm allegedly suffered by the public from exposure to environmental lead. The Complaint alleges that any exposure to lead poses the same health risks, but that utility workers are at a "***uniquely high*** risk" because of their direct contact with cables. Compl. ¶ 48 (emphasis added); *see also id.* ¶ 6. A "uniquely high" risk relative to other members of the public is by definition a difference of ***degree***, not of ***kind***. Restatement (Second) of Torts § 821C, cmt. b. For this reason as well, Plaintiff cannot allege a special injury. *Boteach v. Socialist People's Libyan Arab Jamahiriya*, 759 F. Supp. 2d 548, 551 (D.N.J. 2010) ("[A]llegations as to greater extent fail[] to sufficiently allege a different ***kind*** of injury.").[7]

**B.    The Complaint fails to allege interference with a common right.**

Count 3 separately fails as a matter of law because the Complaint does not allege interference with a "right common to the general public." Restatement (Second) of Torts § 821B(1). A common right—also known as a "public right"—is

---

[7] For the reasons set forth *supra* in Argument Section I.A, Plaintiff has also failed to plead traceability and redressability for purposes of his nuisance claim.

one that is "collective in nature," such as use "of a public highway or a navigable stream." *Lead Paint*, 924 A.2d at 495, 497 (quoting Section 821B, cmts. b, g).  It is distinct from any "***individual*** right" such as the right "not to be assaulted or defamed or defrauded or negligently injured." *Id.* at 497 (quoting Section 821B, cmt. g).  The "personal right not to be negligently injured is not a common right actionable in public nuisance." *Barnett v. Six Flags Great Adventure*, 2018 WL 2056154, at *2 (D.N.J. May 2, 2018).

Courts thus reject as a matter of law general invocations of a public right to health and safety like the one alleged here.  *See* Compl. ¶ 127.  The "allegation that defendants have interfered with the 'health, safety, peace, comfort or convenience of the residents of the [s]tate' standing alone does not constitute an allegation of interference with a public right." *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 453 (R.I. 2008) (quoting *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1114 (Ill. 2004)).  Holding otherwise would "change the meaning of public right to encompass all behavior that causes a widespread interference with the private rights of numerous individuals." *Id.* at 454; *see also City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 475 (S.D. W. Va. 2022) (widespread distribution of opioids did not interfere with a public right); *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 727 (Okla. 2021) (same); *Beretta*, 821

N.E.2d at 1114 (rejecting nuisance claim predicated on "unreasonable jeopardy to health, welfare, and safety" caused by illegal firearms).

Count 3 fails for this reason as well.  The Complaint seeks to do exactly what New Jersey public nuisance law and the Restatement prohibit—elevate a risk of individualized injury to public nuisance status.  Such a sweeping interpretation of the "public right" element would be contrary to New Jersey's adherence to the "traditional interpretation" of public nuisance claims.  *Lead Paint*, 924 A.2d at 427; *see also* Restatement (Second) of Torts § 821B.  Count 3 should be dismissed.[8]

## IV.   All Claims are Time-Barred.

The Court should also dismiss all claims for the independent reason that they are untimely under the applicable statutes of limitations, which are—at most—six years.[9]  Granting a Rule 12(b)(6) motion based on limitations grounds is proper if the complaint and other sources that a court may properly look to under Rule 12 "facially show[] noncompliance with the limitations period."  *Caleb v. CRST, Inc.*,

---

[8] To the extent Plaintiff seeks remedial medical monitoring in conjunction with his nuisance claim, that request also fails as a matter of law for the reasons set forth *supra*.

[9] The limitations period for any allegation of negligence and negligence per se, or any request for medical monitoring, is two years, and the limitations period for any other requested relief is no more than six years.  *See* N.J. Stat. §§ 2A:14-1, 2A:14-2; *see also Harris v. Advance Process Supply, Co*., 2009 WL 1789545, at *9 (N.J. App. Div. June 25, 2009); *Haddonbrook Assocs. v. GE*, 427 F. App'x 99 (3d Cir. 2011).

43 F. App'x 513, 515 (3d Cir. 2002) (citing *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

On its face, the Complaint in this case demonstrates that Plaintiff's claims accrued in 1990, when he began working for Comcast.  Compl. ¶ 15; *see also Lockhart v. Dorrance Publ'g Co., Inc.*, 2023 WL 157323, at *3 (D.N.J. Jan. 11, 2023) (claims accrue when "the party seeking to bring the action ha[s] an enforceable right").  According to Plaintiff, by 1990 he was working with cables and allegedly exposed to lead, and scientific research had shown "that telecom workers who work with or near the cables have elevated levels of lead in their bodies."  Compl. ¶¶ 6, 15.  OSHA also had been regulating telecom work on utility poles and occupational lead exposure for over a decade.  29 C.F.R. §§ 1910.268, 1910.1025 (both initially codified in the 1970s).  Indeed, ten years **before** Plaintiff started with Comcast, a "study of 90 cable splicers found that the average lead levels in [their] blood … was more than 27 micrograms per deciliter," and the union representing communications workers had become aware that lead from cables "could harm workers."  Compl. ¶¶ 51, 59.  This "wide availability of information documenting the risk of exposure" to lead and its extensive "regulation by the federal government" was enough to put Plaintiff on notice when he first started with Comcast that he "worked with" and was "being exposed to" a toxic substance.  *Blanyar v. Genova Prod. Inc.*, 861 F.3d 426, 432-33 (3d Cir. 2017) (affirming dismissal of toxic exposure claims as time-barred).

30

Plaintiff tries to avoid this time-bar by summarily invoking the delayed discovery rule and equitable tolling based on fraudulent concealment, but he does not adequately allege either exception. Compl. ¶ 75. To survive a motion to dismiss based on the discovery rule, the pleadings must plausibly demonstrate why Plaintiff "'could not, by the exercise of reasonable diligence, have discovered essential information' about the alleged" claim. *Lockhart*, 2023 WL 157323, at *5 (citation omitted). The Complaint does not—and cannot—plead any facts on which to infer that this exception might apply. The allegations and judicially noticeable federal regulations establish that Plaintiff should have and easily could have discovered all of the information necessary for his claim as soon as he became a utility worker.

The remedy of medical monitoring is particularly ill-suited to any application of the discovery rule. A claim for medical monitoring "preclude[s] application of the discovery rule" where it "recognizes the extent to which the" allegedly toxic substance "had been 'well-studied and well-documented'" for decades prior to plaintiff's initial exposure. *Blanyar*, 861 F.3d at 432 (affirming dismissal of toxic exposure claims on limitations grounds under Pennsylvania's similar discovery rule). The allegations in the Complaint and relevant federal regulations confirm that Plaintiff is time-barred from now seeking medical monitoring.

Nor can Plaintiff adequately allege equitable tolling based on fraudulent concealment. This exception requires "some sort of trickery or act of concealment"

31

and "must be pled with particularity pursuant to Rule 9(b)." *Lockhart*, 2023 WL 157323, at *4 (citation omitted). Plaintiff cannot satisfy that requirement here. Federal law required Comcast to make sure Plaintiff was adequately trained about the hazards of his occupation, and he does not plead that Verizon concealed information Comcast was required by law to provide.

In addition, Plaintiff's conclusory claim that Verizon made "affirmative misrepresentations and omissions to Plaintiffs" is unsubstantiated by any factual allegations. Compl. ¶ 77. The Complaint does not identify a single statement made by either Defendant, much less a ***deceptive*** one. Nor does the Complaint allege that Plaintiff ever communicated with Verizon such that he was in any position to hear an allegedly misleading statement or omission, or could have reasonably relied on a statement or omission to his detriment. By any pleading standard, the claim of fraud is unsubstantiated, and Plaintiff does not attempt to meet the higher standard of Rule 9(b), which requires alleging "the who, what, where, and when of the purported fraud that prevented Plaintiffs from discovering the [alleged] misconduct." *Lockhart*, 2023 WL 157323, at *4 (citation omitted). No exception to the statutes of limitations applies, so the Complaint should be dismissed in its entirety as untimely.[10]

---

[10] Plaintiff does not allege any other basis for tolling. Compl. ¶¶ 73-78. The Complaint references "delayed discovery" in addition to the "discovery rule," but New Jersey has not recognized a "delayed discovery" exception to limitations periods distinct from the discovery rule discussed here. Plaintiff claims the alleged

## V.     The Court Should Dismiss the Class Allegations.

Plaintiff also purports to plead a class claim under Fed. R. Civ. P. 23(b)(3) "to secure redress for injuries sustained and to obtain class wide abatement relief." Compl. ¶¶ 79-80.   As set forth below, under Rule 12(b)(6), courts dismiss at the pleading stage class allegations arising from claims of personal injury to spare judicial and party resources from the costs and burdens of discovery on a class that can never be certified.  *See, e.g.*, *Lafferty*, 2018 WL 3993448, at *5-6.

### A.     Personal injury classes are not appropriate for class treatment and regularly fail at the pleading stage.

Any request for class treatment must plead—and ultimately satisfy—the requirements of class treatment.  For an alleged Rule 23(b)(3) class, those include the well-known elements of numerosity, commonality, typicality, adequacy, predominance, and superiority.  *See* Fed. R. Civ. P. 23(a), (b)(3); *see also Lafferty*, 2018 WL 3993448, at *3 (dismissing class claims for medical monitoring).[11]   And,

---

public nuisance is "of a continuing nature," but that does not make Count 3 timely. *Id*. ¶ 129(c).   In this exposure-based claim, there is no "new injury" within the limitations period.  *Haddonbrook*, 427 F. App'x at 102.

[11] To the extent claims seek injunctive relief, class treatment is traditionally considered under Rule 23(b)(2), which is not pleaded here.  Although it lacks the reference to predominance in subsection (b)(3), Rule 23(b)(2) requires that "the class claims … be cohesive."  *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998); *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011).  This cohesiveness requirement operates much like the predominance requirement of Rule 23(b)(3), but is "more stringent."  *Bennett v. Quest Diagnostics, Inc.*, 2023 WL 3884117, at *12 (D.N.J. June 8, 2023).

of course, the claims of individual putative class members must be timely. *See, e.g.*, *MSP Recovery Claims, Series LLC and Series 17-04-631 v. Plymouth Rock Assurance Corp., Inc.*, 404 F. Supp. 3d 470, 484 (D. Mass. 2019) (striking class allegations where "the class definition would include [members] with claims that are time barred").

Courts widely hold that tort claims alleging personal injury—including those that, like this one, seek medical monitoring—cannot meet these requirements as a matter of law where resolving these claims requires certain individualized inquiries. For example, class treatment is inappropriate where resolution of the claims requires individualized inquiries into the "individual medical histories" of each putative class member; the degree of alleged exposure to the relevant toxin; whether the individual circumstances of any given class member—such as age, health, and lifestyle—mitigate or exacerbate the alleged risk of developing a serious latent disease from the toxin; and whether a medical monitoring regime will be reasonably medically necessary or valuable for that individual. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 603, 624-25 (1997); *Gates*, 655 F.3d at 268-70. Medical monitoring claims alleging injury from exposure to a toxin simply raise "too many individual issues" for class treatment. *Barnes*, 161 F.3d at 143; *see also In re St. Jude Med., Inc.*, 425 F.3d 1116, 1122 (8th Cir. 2005) (collecting cases rejecting class treatment); *Goasdone v. Am. Cyanamid Corp.*, 808 A.2d 159, 169 (N.J. Super. 2002).

34

These issues also are "plain enough from the pleadings to determine" that a class claim cannot proceed and should be dismissed at the outset of a case. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982). In *Lafferty*, the court dismissed putative class claims for medical monitoring based on lead and arsenic exposure. 2018 WL 3993448, at *6. The nature of the claim made it evident that plaintiff could not satisfy the "demanding" predominance requirement because "individual fact finding [would be] *essential* to determine whether one of these hazardous substances impacted someone." *Id*. Plaintiff could not allege "on a *class-wide basis*" entitlement to medical monitoring. *Id*. at *5. It "makes little sense to adjudicate what are essentially individual personal injury cases on a class-wide basis," and so pleading such a claim under Rule 23 "makes clear that the purported class cannot be certified and no amount of discovery would change that." *Faulhaber v. Petzl Am., Inc.*, __ F. Supp. 3d __, 2023 WL 1993612, at *10-11 (D. Colo. 2023) (citation omitted); *see also Cashatt v. Ford Motor Co.*, 2021 WL 1140227, at *2 (W.D. Wash. Mar. 24, 2021) (striking allegations in part because of the "breadth of Plaintiffs' class based on the variety of distinct injuries alleged); *In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*, 208 F.R.D. 625, 632 (W.D. Wash. 2002) (similar).

### B.   The Complaint cannot plead the requirements for certification, and no amount of discovery can correct those deficiencies.

Even more than in other cases alleging toxic exposure, the Complaint itself demonstrates that class treatment is unavailable here as a matter of law. Plaintiff

alleges a class of "utility pole workers who were occupationally exposed to Defendants' lead-sheathed cables in New Jersey," excluding Verizon's own current employees. Compl. ¶ 79. On its face, the pleading demonstrates that the putative class will include time-barred members like Plaintiff. *See supra*; *MSP Recovery*, 404 F. Supp. 3d at 484.

Moreover, the nature of Plaintiff's claims demonstrate that individualized issues necessarily will predominate, and that class certification could not be the superior way to adjudicate the claim of any given pole worker. The mere question of ***exposure*** necessarily entails individualized inquiry, as proposed class members' "potential exposures, if any, are likely drastically different." *Lafferty*, 2018 WL 3993448, at *6. For instance, each proposed class member will have different levels of exposure depending on: (1) how long he or she was employed as a utility pole worker; (2) how often he or she climbed poles with lead-sheathed cables; (3) to what extent was there incidental contact with those cables; (4) how regularly did the putative class member wear protective equipment or take other safety precautions; (5) to what extent has the putative class member encountered other sources of lead exposure; and (6) to what extent does the putative class member's family medical history and lifestyle already increase susceptibility to broadly alleged conditions like mood changes or decreased cognitive function? Compl. ¶¶ 30-32. The "only way to determine whether [any putative class member has] been exposed is an individual

inquiry." *Lafferty*, 2018 WL 3993448, at *6. But the Complaint cannot plead that factual predicate on a class-wide basis, and the Court cannot conduct that individualized inquiry in discovery "for thousands of people and call it a class-action." *Id*. (dismissing class monitoring allegations in pleadings).

Further making it "plain" that class treatment is inappropriate, liability to a class alleging ***occupational*** exposure introduces even more individualized considerations for each putative class member: (7) who was his or her employer; (8) did that employer violate workplace safety regulations, including longstanding ones under OSHA, *see supra*; (9) has the putative class member collectively bargained for additional safety measures that the employer either was or was not providing; (10) is the employer or any union already providing lead screening or other medical services?

Plaintiff's overbroad claims of potential medical conditions also introduce unavoidable individual inquiries about the risk of contracting any disease. *See Lafferty*, 2018 WL 3993448, at *6. Plaintiff does not allege that any particular "concentration" of lead creates a "danger point for all class members." *Gates*, 655 F.3d at 267. Quite the opposite—the allegations admit that there is no such common danger point when it comes to lead exposure. As Plaintiff alleges, "[i]ndividuals exposed to toxic lead may not develop lead-related conditions, or show lead-related symptoms, until years after the lead exposure," and "[t]he absorption and biological

fate of lead once it enters the human body ***depends on a variety of factors***."  Compl.
¶¶ 41-42 (emphasis added).  Individuals exposed to lead may have "no symptoms,"
delayed symptoms that do "not appear right away," or symptoms that "flare up
sporadically at irregular times."  Compl. ¶ 46.  And "symptoms" here could refer to
a broad range of conditions, from the mundane to the serious.  Dismissal is warranted
where Plaintiff's own allegations demonstrate that there can be no "threshold"
danger point because "each class member … may be more or less susceptible to
diseases from exposure" to lead.  *Gates*, 655 F.3d at 268; *see also* Compl. ¶ 45
(identifying various individualized conditions that increase risk of harm from lead);
*Cashatt*, 2021 WL 1140227, at *2.

Moreover, in ***any*** medical monitoring case, the Third Circuit has repeatedly
held that an individual's reasonable need for medical monitoring "by definition
cannot" be "proved on a classwide basis."  *Gates*, 655 F.3d at 268-69 (quoting
*Barnes*, 161 F.3d at 146).  Whether "medical monitoring is reasonable and necessary
for each class member" depends on "the class member's unique medical history
(which may involve unrelated factors that could also require the medical
monitoring)."  *Goasdone*, 808 A.2d at 170.  Plaintiff's own allegations establish that
the manifestation of harm from lead exposure depends on "[b]one-to-blood lead
mobilization" that is "unpredictable" but "increases during periods of: advanced age;
broken bones; chronic disease; hyperthyroidism, immobilization (e.g., bedridden);

kidney disease; lactation; menopause; physiologic stress; and pregnancy." Compl. ¶ 45. In other words, Plaintiff concedes the need for medical monitoring here would depend on "class members' individual characteristics and medical histories." *Gates*, 655 F.3d at 269. The individualized inquiries required for ***any*** medical monitoring case—which cover lifestyle issues, family history, comorbidities, plus those individualized inquiries that Plaintiff admits are required in the lead context—will dominate the question of whether medical monitoring is reasonable, necessary, and valuable.

The pleadings alone demonstrate that class treatment is unavailable. Even taking Plaintiff's allegations as true, "there simply are not facts that could later be discovered that would render the complex, ubiquitous individualized questions of harm and causation that pervade this case amenable to collective resolution." *Jones v. BRG Sports, Inc.*, 2019 WL 3554374, at *6 (N.D. Ill. Aug. 1, 2019).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaint in its

entirety.

Respectfully submitted,

 s/ Jennifer L. Del Medico
Leon F. DeJulius Jr.
Sharyl A. Reisman
Jennifer L. Del Medico
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: +1.212.326.3939
Facsimile:  +1.212.755.7306

Bridget K. O'Connor
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 200001
Telephone: +1.202.879.3939
Facsimile:  +1.202.626.8585

*Counsel for Defendants*