UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREG BOSTARD and TONY ROCKHILL, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>VERIZON COMMUNICATIONS INC., and VERIZON NEW JERSEY, INC.,<br><br>*Defendants.* | Case No. 1:23-cv-08564-JHR |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR STRIKE
THE SECOND AMENDED COMPLAINT**

# Table of Contents

**Page**

Table of Authorities ......................................................................... iii

Introduction ...................................................................................... 1

Factual Background ......................................................................... 2

Argument ........................................................................................... 6

    I.     Plaintiffs Have Article III Standing ................................. 6

          a.  Plaintiffs Have Article III Standing to Pursue
              Their Medical Monitoring Claims ............................. 6

          b.  Plaintiffs Have Article III Standing to Pursue
              Their Abatement Claims ............................................ 9

    II.    Plaintiffs' Claims Are Timely Under the Continuing
          Tort Doctrine and the Discovery Rule .......................... 11

    III.   Plaintiffs State a Claim for Negligence and Properly
          Allege Their Entitlement to Medical Monitoring ........ 15

          a.  Verizon had a duty to anticipate the danger its
              misconduct would cause utility pole workers ........ 15

          b.  Plaintiffs have suffered an injury in the form of
              the present need for medical monitoring ............... 17

          c.  Plaintiffs have alleged the elements required for medical
              monitoring relief ...................................................... 19

    IV.   The SAC States a Claim for Negligence Per Se (Count 2) .......... 19

    V.    The SAC States a Claim for Public Nuisance (Count 3) ............. 27

    VI.   The Court Should Not Dismiss the Class Allegations ................. 30

a. Verizon does not challenge Plaintiffs' "abatement" remedy ................................................................. 31

b. It is premature to decide issues related to class certification ................................................................. 32

c. This case is suitable for class treatment ................................. 34

   1. The proposed class satisfies each 23(a) requirement ......... 34

   2. The proposed class satisfies the requirements of 23(b) ..... 37

# Table of Authorities

**Page(s)**

**Cases**

*Air & Liquid Sys. Corp. v. DeVries,*
    586 U.S. 446 (2019) ........................................................15

*Ayers v. Jackson Twp.,*
    106 N.J. 557 (1987) .................................................. passim

*Babbitt v. United Farm Workers Nat'l Unions,*
    442 U.S. 289 (1979) ..........................................................9

*Baby Neal for & by Kanter v. Casey,*
    43 F.3d 48 (3d Cir. 1994) ................................................37

*Barnes v. Am. Tobacco Co.,*
    161 F.3d 127 (3d Cir. 1998) ...........................................39

*Bernbach v. Timex Corp.,*
    989 F. Supp. 403 (D. Conn. 1996) .................................23

*Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls,*
    536 U.S. 822 (2002) ........................................................10

*Biglioli v. Durotest Corp.,*
    44 N.J. Super. 93 (App. Div. 1957) ................................12

*Black v. Pub. Serv. Elec. & Gas Co.,*
    56 N.J. 63 (1970) ..................................................... 15, 16

*Blake v. JP Morgan Chase Bank NA,*
    927 F.3d 701 (3d Cir. 2019) ...........................................12

*Blanyar v. Genova Prod. Inc.,*
    861 F.3d 426 (3d Cir. 2017) ...........................................14

*Block v. RBS Citizens, Nat'l Ass'n, Inc.,*
    2016 WL 8201853 (D.N.J. Dec. 12, 2016) ................. 34, 37

*City of Newark v. City of New York*,
  2021 WL 3174983 (D.N.J. Mar. 30, 2021) ........................................................27

*Collier v. Montgomery Cnty. Hous. Auth.*,
  192 F.R.D. 176 (E.D. Pa. 2000) ........................................................................31

*Colon v. Tedesco*,
  125 N.J. Super. 446 (Law Div. 1973) ................................................................29

*Corradetti v. Sanitary Landfill, Inc.*,
  912 F. Supp. 2d 156 (D.N.J. 2012) ....................................................................27

*Covington v. Jefferson Cnty.*,
  358 F.3d 626 (9th Cir.2004) ..............................................................................10

*Donovan v. Philip Morris USA, Inc.*,
  268 F.R.D. 1 (D. Mass. 2010) ...................................................................... 30, 38

*Eaton v. Eaton*,
  119 N.J. 628 (1990) ...................................................................................... 22, 23

*Elliott v. Chicago Hous. Auth.*,
  2000 WL 263730 (N.D. Ill. Feb. 28, 2000) .......................................................31

*Free Speech Coal., Inc. v. Att'y Gen. United States*,
  825 F.3d 149 (3d Cir. 2016) ................................................................................9

*Freedom from Religion Found. Inc.*,
  832 F.3d 469 ......................................................................................................10

*Fresh Air for the Eastside, Inc. v. Waste Management of New York, L.L.C.*,
  405 F. Supp. 3d 408 (W.D. N.Y. 2019) .............................................................22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000) ...........................................................................................10

*Gates v. Rohn and Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) ..............................................................................39

*German v. Fed. Home Loan Mortg. Corp.*,
    885 F. Supp. 537 (S.D.N.Y. 1995) ........................................................31

*Haddonbrook Assocs. v. Gen. Elec. Co.*,
    427 F. App'x 99 (3d Cir. 2011)............................................................13

*Hurt v. Philadelphia Hous. Auth.*,
    151 F.R.D. 555 (E.D. Pa. 1993) ..........................................................31

*In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*,
    537 F. Supp. 3d 679 (D.N.J. 2021)........................................... 19, 32, 33

*In re Diet Drugs Prod. Liab. Litig.*,
    1999 WL 673066 (E.D. Pa. Aug. 26, 1999).........................................39

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,
    2015 WL 4092866 (S.D. Ohio July 6, 2015) .......................................25

*In re Lead Paint Litig.*,
    191 N.J. 405(2007) ............................................................................27

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002) ...............................................................36

*In re Nat'l Football League Players Concussion Inj. Litig.*,
    821 F.3d 410 (3d Cir. 2016) ......................................................... passim

*In re Paoli R.R. Yard PCB Litig.*,
    916 F.2d 829 (3d Cir. 1990) ......................................................... passim

*In re Paulsboro Derailment Cases (Paulsboro I)*,
    2013 WL 5530050 (D.N.J. Oct. 4, 2013) .............................................18

*In re Paulsboro Derailment Cases (Paulsboro II)*,
    2013 WL 5936991 (D.N.J. Nov. 4, 2013)..............................................17

*In re Suboxone Antitrust Litig.*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019).....................................................35

*In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*,
2021 WL 100204 (D.N.J. Jan. 12, 2021) ..........................................................6, 8

*In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*,
2023 WL 1818922 (D.N.J. Feb. 8, 2023)...................................................... 30, 40

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
399 F.3d 248 (3d Cir. 2005) ........................................................................ passim

*Jersey City Redevelopment Authority v. PPG Industries*,
655 F.Supp. 1257 (D.N.J. 1987)............................................................................27

*Kubert v. Best*,
432 N.J. Super. 495 (App. Div. 2013)..................................................................16

*Lafferty v. Sherwin-Williams Co.*,
2018 WL 3993448 (D.N.J. Aug. 21, 2018)...................................... 17, 21, 39, 40

*Landsman & Funk PC v. Skinder-Strauss Assocs.*,
640 F.3d 72 ............................................................................................................33

*Lindsey v. Caterpillar, Inc.*,
480 F.3d 202 (3d Cir. 2007) ..................................................................................17

*Lozar v. Birds Eye Foods, Inc.*,
678 F. Supp. 2d 589 (W.D. Mich. 2009)................................................ 23, 25, 26

*Martinez v. Cooper Hosp.-Univ. Med. Ctr.*,
163 N.J. 45 (2000) .................................................................................................14

*Mauro v. Raymark Indus., Inc.*,
116 N.J. 126 (1989) ....................................................................................... 17, 24

*Mayor & Council of Borough of Rockaway v. Klockner & Klockner*,
811 F. Supp. 1039 (D.N.J. 1993).........................................................................29

*McPeak v. S-L Distribution Co.*,
2014 WL 4388562 (D.N.J. Sept. 5, 2014).............................................................32

*Middlesex Cnty. Bd. of Chosen Freeholders v. State of N.J., Dep't of Env't Prot.*,
645 F. Supp. 715 (D.N.J. 1986)............................................................................22

*Neuss v. Rubi Rose, LLC*,
  2017 WL 2367056 (D.N.J. May 31, 2017) ...........................................................32

*Nicolosi v. Smith & Nephew, Inc.*,
  2017 WL 632274 (N.J. App. Div. Feb. 16, 2017)................................................13

*Nuclear Watch New Mexico v. United States Dep't of Energy*,
  2018 WL 3405256 (D.N.M. July 12, 2018) ........................................................24

*Nutrasweet Co. v. X-L Eng'g Corp.*,
  926 F. Supp. 767 (N.D. Ill. 1996)........................................................................24

*R.A.C. v. P.J.S., Jr.,*
  192 N.J. 81, (2007) .............................................................................................14

*Redland Soccer Club, Inc. v. Dep't of Army of U.S.*,
  55 F.3d 827 (3d Cir. 1995) ..................................................................................19

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011) ........................................................................ 6, 7, 8, 9

*Rodriguez v. Nat'l City Bank*,
  726 F.3d 372 (3d Cir. 2013) ................................................................................34

*Rowe v. E.I. Dupont De Nemours & Co.*,
  262 F.R.D. 451 (D.N.J. 2009) ............................................................... 22, 27, 31

*Russo Farms, Inc. v. Vineland Bd. of Educ.*,
  144 N.J. 84 (1996) ............................................................................... 11, 12, 13

*Savage v. Old Bridge-Sayreville Med. Grp., P.A.*,
  134 N.J. 241 (1993) .............................................................................................14

*Severa v. Solvay Specialty Polymers USA, LLC*,
  524 F. Supp. 3d 381 (D.N.J. 2021).................................................................. 27, 28

*Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*,
  2013 WL 5655480 (E.D. Pa. Oct. 17, 2013) ......................................................21

*Stewart v. Abraham*,
  275 F.3d 220 (3d Cir. 2001) ......................................................... 34, 35

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
  2019 WL 8272995 (D. Vt. Aug. 23, 2019) ........................................38

*The Newark Grp. v. Dopaco, Inc.*,
  2010 WL 3619457 (E.D. Cal. Sept. 13, 2010) ..................................23

*Theer v. Philip Carey Co.*,
  133 N.J. 610 (1993) .................................................................. 18, 21

*Tull v. United States*,
  481 U.S. 412 (1987) ................................................................. 31, 38

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................. 37, 38

**Statutes**

29 U.S.C. § 653(b)(4) ....................................................................17

42 U.S. Code § 6972(b)(1)-(2) .......................................................24

42 U.S.C. § 6972(a)(1)(B) ......................................................... 22, 25

**Rules**

Fed. R. Civ. P. 12 ..........................................................................32

Fed. R. Civ. P. 23(b)(2) ............................................................. 37, 38

Fed. R. Civ. P.23(b)(3) .............................................................. 38. 40

**Other Authorities**

3 Newberg on Class Actions § 7:22 (5th ed.) .................................32

*Manual for Complex Litigation* § 22.74 (4th ed. 2004)..........................................38

Restatement (Second) of Torts § 821B(1) ....................................................... 27, 28

Restatement (Second) of Torts § 821C............................................................ 29, 30

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 ......15

# <u>INTRODUCTION</u>

Verizon made a profit-driven decision to expose thousands of utility workers to a lethal toxin due to its refusal to clean up its obsolete lead cable network. Unless this suit is successful, Verizon's lead cables will continue to put thousands of utility workers' health at risk. Utility workers face a choice between paying out of pocket for medical testing to understand the extent to which they have been poisoned or taking a risk on their health. Not only that, but unless this suit is successful, utility workers face a choice between continuing to be poisoned or quitting their jobs.

New Jersey law does not force the victims of corporate misconduct into this choice. Rather, New Jersey holds polluters accountable when their pollution forces people to seek medical monitoring by "allow[ing] post-injury, pre-symptom recovery in toxic tort litigation for reasonable medical surveillance costs." *Ayers v. Jackson Twp.*, 106 N.J. 557, 604 (1987). Indeed, both New Jersey and federal law require polluters to abate dangerous environmental conditions they create.

To avoid paying for the dangers it created, Verizon asks this Court to rewrite New Jersey and federal law to disallow medical monitoring and abatement suits. Verizon argues for an array of rules—some untested, some discredited, but none meritorious—which would preclude virtually all medical monitoring class action cases. But neither the Third Circuit nor the Supreme Court of New Jersey has ever adopted Verizon's extreme positions. This Court should not do so here.

## FACTUAL BACKGROUND

Defendants own and operate telecommunications networks in New Jersey.[1] ¶ 2, 20. Defendants' infrastructure includes a sprawling network of cables covered in toxic lead. *Id.* These lead-sheathed cables—which hang on utility poles, are buried in the soil, and run down the bottom of the Passaic River—were installed years ago as Defendants' predecessors built out telephone service across the U.S. ¶¶ 2-3, 26. When the lead-sheathed cables became obsolete, Defendants abandoned them, rather than properly disposing of them as required by New Jersey and federal law. ¶¶ 2-3, 24. These lead-sheathed cables presently hang on utility poles near at least 64 schools and more than 350 bus stops, drooping as low as 12 feet above driveways and sidewalks where families live and play. ¶¶ 26, 29.

Lead is toxic to humans and no level of exposure is without harmful effects. ¶¶ 33-40. Lead can cause, among many other things, reduced kidney function, decreased blood hemoglobin, neuropathy, neurological problems, decreased cognitive function, hearing and speech problems, reproductive problems, lung disease, learning problems, changes in behavior or personality, headaches, joint pain, trouble concentrating and memory problems. ¶¶ 33-34. Lead is also a probable human carcinogen. ¶ 36. Worldwide, lead exposure is estimated to account for 21.7

---

[1] Unless otherwise noted, all citations to the Second Amended Complaint are done in the form '¶ XX.' Likewise, all citations to all authority omit internal quotations, alternations, and citations, unless otherwise noted.

million years lost to disability and death due to long-term effects on health. ¶ 40.

The body accumulates lead over a lifetime and normally releases it very slowly. ¶ 42. The blood system, which serves as the initial receptacle of absorbed lead, distributes lead to either: (a) soft tissues (e.g., liver, kidneys, lungs, brain, spleen, muscles and heart), where it causes near-term damage; or (b) mineralizing tissue (e.g., bones and teeth), where it is stored in inert form and can sporadically re-release back into circulation and cause damage in the years and decades after the initial exposure. ¶¶ 45-50. Thus, individuals exposed to lead may not develop lead-related conditions, or show lead-related symptoms, until years or decades after the exposure. ¶ 44, 50.

Defendants' cables leach lead into the surrounding environment. ¶¶ 22, 24. Moisture in the environment causes the lead on the outside of the cables to take on a dust-like quality. ¶¶ 22. This dusting of silvery lead is so soft and thick that people can scribble messages in it. ¶ 52. Lead washes off the cables as it rains, contaminating the nearby soil. ¶ 23. Testing conducted by several independent laboratories shows that lead levels in the environments near Defendants' lead-sheathed cables exceed safety recommendations set by the U.S. Environmental Protection Agency. ¶¶ 28-32.

Current and former utility workers are at a uniquely high risk of toxic lead exposure from Defendants' cables. ¶ 51. Utility workers must manhandle

Defendant's cables to perform their work, and their jobs put them in constant contact with the cables and the surrounding environment. ¶ 7. The lead-sheathed cables hang on the same poles that carry other types of utility cables. ¶ 53. Workers servicing the other cables must walk on the ground underneath Defendants' cables, climb up to and over Defendants' cables (which, in New Jersey, are low on the stack), interact with and touch Defendants' cables, perform their work in very close proximity to Defendants' cables, and inhale the air surrounding Defendants' cables. *Id.* Numerous studies have shown that utility workers with exposure to lead-sheathed cables have elevated lead levels in their blood and/or bones. ¶¶ 54-56.

Defendants have been on notice of the dangers posed to utility workers for decades. ¶ 57. Internal documents from Defendants' corporate predecessors have long recognized that handling the cables exposes utility workers to lead dust, and that lead from the cables can leach into the surrounding environment. ¶ 58. Studies and testing conducted by Defendants and their predecessors between 1970 and 2016 show that employees who regularly worked with the cables had high amounts of lead in their bodies. ¶¶ 60-64. The health and environmental risks posed by the cables were openly discussed at a gathering of telecom officials more than a decade ago. ¶¶ 66-68. Notwithstanding their knowledge of the risks, Defendants left the cables in place, failed to adequately asses and dispose of the cables as required by New Jersey and federal law, and unnecessarily exposed New Jersey utility workers to toxic lead

over the course of several decades. ¶ 69.

Plaintiffs are current and former utility workers who serviced utility cables that hung on the same poles as Defendants' lead-sheathed cables. ¶¶ 14-16. While performing their jobs, Plaintiffs were forced to regularly touch and interact with Defendants' cables, and thereafter touched their eyes and mouths with their hands that had been contaminated with lead dust from Defendants' cables. *Id.* In that way, Plaintiffs ingested and inhaled lead from Defendants' cables over the course of many years. *Id.*

Because no amount of lead exposure is without harmful effects, and in light of the risk that lead stored in the body from prior exposures may not manifest into lead-related conditions until years or decades after the exposure, Plaintiffs have a present need to obtain testing and other medical surveillance to determine the extent that they were poisoned and permit the earliest possible diagnosis and treatment of any future lead-related conditions. ¶¶ 8, 14, 38, 73. This special monitoring, which was made necessary by Defendants' conduct, goes beyond the medical care individuals receive in the ordinary course. *Id.* Indeed, Defendants provide a similar health program to their own employees, but do not presently pay for the cost of such medical monitoring for individuals, like Plaintiffs, who were exposed to Defendants' cables while working for other companies. ¶ 74.

## ARGUMENT

## I.    Plaintiffs Have Article III Standing.

### a. Plaintiffs Have Article III Standing To Pursue Their Medical Monitoring Claims.

The Third Circuit has "unequivocally determined" that exposure to toxic substances constitutes an injury-in-fact in medical monitoring cases. *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 100204, at *12 (D.N.J. Jan. 12, 2021) (citing *Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011) and *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 850-852 (3d Cir. 1990)). Indeed, exposure to a toxic substance necessarily "causes injury" because "cells are damaged and a disease mechanism has been introduced." *Reilly*, 664 F.3d at 45. Accordingly, plaintiffs that have been exposed to toxic substances have standing to seek "the cost of the medical care that will, one hopes, detect that injury." *Paoli*, 916 F.2d at 850.

There is no level of lead exposure that is known to be without harmful effects. ¶¶ 38-39. Because of Defendants' conduct, Plaintiffs were exposed to and ingested toxic lead and were thus necessarily harmed. ¶¶ 8, 14-16, 42-42, 73. Lead can be stored in bones in teeth for decades, and thereafter sporadically release back into the blood stream through blood-to-bone mobilization, causing lead-related conditions in the years and decades after the initial exposure. ¶¶ 8, 14, 43, 73. Therefore, Plaintiffs have a present medical need to: (a) obtain testing to determine the extent of the damage caused by the exposure and whether any of the lead remains in their systems

today; and (b) receive going-forward surveillance to permit the earliest possible diagnosis and treatment of any lead-related conditions that manifest in the future. ¶¶ 8, 14, 73.

Verizon argues that Plaintiffs lack a "concrete" injury because they have not "been diagnosed with a lead-related condition" and are not presently "seeking personal injury damages." ECF 27-1 at 9. This argument misunderstands the nature of a pre-diagnosis medical monitoring claim. If a plaintiff has *already* been diagnosed with an injury, they would seek damages for personal injury, not for medical monitoring. But where, as here, a plaintiff has been exposed to a toxic substance but has not yet been diagnosed with a related condition, the injury is the cost of medical care made necessary to identify the damage and monitor the plaintiff's body for the onset and development of future conditions. *Paoli*, 916 F.2d at 850. When a subsequent condition develops, "the plaintiff may or may not have a [separate] cause of action against the same defendant for the injury itself." *Id.* at 850, n.24. But a plaintiff need not wait until the onset and diagnosis of a condition to bring a claim for medical monitoring. *Reilly*, 664 F.3d at 45 ("Waiting for [the] plaintiff to suffer physical injury before allowing any redress whatsoever is both overly harsh and economically inefficient").

Tellingly, Verizon's "concrete" injury argument relies exclusively on data breach cases and other cases *outside* of the medical monitoring context. ECF 27-1 at

7

9-10. Each of these cases is inapposite because the Third Circuit has made clear that the Article III standing analysis in medical monitoring cases is unique. For example, in *Reilly*, the Third Circuit held that, unlike plaintiffs asserting pre-misuse data breach claims, plaintiffs who have been exposed to toxic substances have standing to pursue pre-diagnosis medical monitoring because:

> [T]oxic-substance-exposure cases confer standing based on two important factors not present in data breach cases. First, an injury has undoubtedly occurred. … [E]xposure to a toxic substance causes injury; cells are damaged and a disease mechanism has been introduced. Hence, the damage has been done; we just cannot yet quantify how it will manifest itself. Second, standing in … toxic-tort cases hinges on human health concerns. Courts resist strictly applying the 'actual injury' test when the future harm involves human suffering or premature death. *Id.*

Ignoring the medical monitoring case law, Verizon argues that "[t]he cost of testing that is sought as a proposed remedy to detect whether lead is present cannot be an existing concrete injury that confers standing to file suit in the first place." ECF 27-1 at 10. But, as discussed above, the Third Circuit has "unequivocally" held otherwise. *Valsartan*, 2021 WL 100204 at *12. While Verizon is free to ask the Third Circuit to overrule its precedent, it cannot, under current law, negligently abandon toxic lead in Plaintiffs' workspace, cause Plaintiffs to suffer years of needless exposure, and avoid paying for the medical surveillance made necessary by their actions on the grounds that Plaintiffs have not yet been diagnosed with a condition. *Cf. Ayers*, 106 N.J. at 599–600 (stating that, under New Jersey law, "even

in the absence of a physical injury," and even if the "tests prove negative," medical monitoring plaintiffs can "recover the cost for the various diagnostic examinations proximately caused by [defendant's] negligent action").

Verizon's "imminent harm" argument is similarly without merit. Plaintiffs were exposed to and ingested lead from Verizon's cables (¶¶ 14, 16) and have thus *already* been harmed by Defendants' conduct. *Reilly*, 664 F.3d at 45. As a result, Plaintiffs have a *present* economic injury for the cost of medical treatment made necessary by Defendants' actions. *Ayers.*, 106 N.J. at 604 (noting that "[i]t is inequitable for an individual, wrongfully exposed to dangerous toxic chemicals … to have to pay his own expenses").

### b. Plaintiffs Have Article III Standing To Pursue Their Abatement Claims.

Standing to seek injunctive relief requires a plaintiff to show (1) "that he is under threat of suffering 'injury in fact' that is concrete and particularized"; (2) the threat is "actual and imminent, not conjectural or hypothetical"; (3) the threat is "fairly traceable to the challenged action of the defendant"; and (4) it is "likely that a favorable judicial decision will prevent or redress the injury." *Free Speech Coal., Inc. v. Att'y Gen. United States*, 825 F.3d 149, 165-166 (3d Cir. 2016). Several specific principles bear on the standing analysis here. *First*, "threatened rather than actual injury can satisfy Article III standing requirements." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 257 (3d Cir. 2005); *Babbitt v. United Farm*

*Workers Nat'l Unions*, 442 U.S. 289, 298 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief."). *Second*, a plaintiff's present concerns based on residence or employment near a toxin are a legally cognizable injury supporting standing to pursue injunctive relief. *Interfaith Cmty. Org.*, 399 F.3d at 256 (plaintiffs had standing to seek injunctive relief where they lived near toxic waste site); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 638–39 (9th Cir.2004) (landowners who lived across from county landfill satisfied Article III injury-in-fact requirement). *Third*, where multiple plaintiffs seek the same injunctive relief, the Court need only find that one of the plaintiffs has standing prior to dispensing with the defendant's motion. *Freedom from Religion Found. Inc.*, 832 F.3d at 481 n.14 ("Since we have concluded Schaub has standing to seek equitable relief, we need not address the standing of the other plaintiffs to pursue injunctive relief.") (citing *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 826 n.1 (2002) (explaining that because one party has standing, it is unnecessary to address whether the other party also has standing to challenge the school's suspicion-less drug testing policy)).

Here, both Plaintiffs have standing to seek abatement and removal of Defendants' lead-sheathed cables. Mr. Rockhill is presently employed as a utility worker, and his job will bring him into future occupational contact with Defendants' cables. ¶ 16. And Mr. Bostard presently lives near numerous of Defendants' cables, which have polluted and continue to pollute the environment surrounding his home. ¶¶ 14-15. These allegations suffice to support standing for injunctive relief.

## II.    Plaintiffs' Claims Are Timely Under the Continuing Tort Doctrine and the Discovery Rule.

This case is about Verizon's failure to abate a dangerous condition—a network of lead cables that leach dangerous lead dust or tarnish. Rather than take responsibility for those cables and clean them up, Verizon has instead chosen to attack the well-founded concerns of utility workers who have been exposed to these cables as "irrational fears stoked by dubious journalism." ECF 18-1. Verizon's present failure to abate its lead cables means its misconduct falls within the continuing tort doctrine. Similarly, its choice to not reveal the extent to which its lead cables leached dangerous lead means that Plaintiffs' claims did not accrue under the discovery rule until (at the earliest) the publication of the Wall Street Journal article in 2023, which revealed this hidden danger to the public.

**Continuing Tort Doctrine**: "The continuing tort doctrine is an established doctrine in New Jersey[.]" *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 144 N.J. 84, 99 (1996) It rests on the idea that some torts stem from continuing duties, like a

"duty on the defendant to remove" a nuisance or dangerous condition. *Id.* at 100. When a court holds that such a continuing tort is being committed, "it implicitly holds that the defendant is committing a new tort, including a new breach of duty, each day, triggering a new statute of limitations." *Id.* at 99; *accord Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 706 (3d Cir. 2019) (if a law "forbids diffuse conduct, comprising many acts at different times, then the continuing-violation doctrine applies."). "[T]he negligent exposure of an employee to some occupational poison over a period of time is one form of a continuing tort[.]" *Biglioli v. Durotest Corp.*, 44 N.J. Super. 93, 103 (App. Div. 1957), *aff'd,* 26 N.J. 33 (1958). "[T]he act or acts causing the inhalation of poisonous dust are looked upon as a single, indivisible continuing wrong[.]" *Id.* In such circumstances, "[t]he statute does not start running until the continuous wrongful conduct has come to an end." *Id.*

Each of Plaintiffs' claims stems from Verizon's failure to meet its duty to remove its dangerous lead cables, causing Plaintiffs to be negligently exposed to an occupational and environmental poison. Under *Russo* and *Biglioli*, such claims clearly fall within the scope of the continuing tort doctrine. Plaintiffs' claims are thus timely because Verizon's "continuous wrongful conduct" has not ended. *Id.*

Verizon entirely ignores *Russo* and *Biglioli*. It instead suggests, based on selective quotation from an unpublished Appellate Division decision, *Nicolosi v. Smith & Nephew, Inc.*, that the continuing tort doctrine is limited to discrimination

and harassment claims. ECF 27-1 at 17 (citing 2017 WL 632274, at *3 (N.J. App. Div. Feb. 16, 2017)). But that is clearly wrong based on *Russo* and *Biglioli*. Nor is it what *Nicolosi* says. Far from limiting the continuing tort doctrine in this way, *Nicolosi* instead recognized that discrimination and harassment claims were particularly likely to implicate the continuing tort doctrine because "[t]heir very nature involves repeated conduct" occurring not on "any particular day" but rather "over a series of days or perhaps years." *Id.* Precisely the same is true for the claims in this case.

Verizon's attempt to rely on *Haddonbrook Assocs. v. Gen. Elec. Co.*, another unpublished decision where the Court made clear it was "writ[ing] only for the parties," is even less persuasive. ECF 27-1 at 17 (citing 427 F. App'x 99, 99 (3d Cir. 2011)). *Haddonbrook* rested on the distinction between an unabatable nuisance— sometimes called a permanent nuisance—and an abatable nuisance—sometimes called a temporary nuisance. *Id.* at 102. As *Russo* recognized, the distinction between these two types of nuisance is "important" "for statute of limitations" because the former is not a continuing tort but the latter is. *Russo*, 144 N.J. at 100. *Haddonbrook* simply applied this rule to a particular permanent nuisance. *Haddonbrook*, 427 F. App'x at 102.  But where, as here, the nuisance is abatable, *Haddonbrook* has no application.

**Discovery Rule:** "The discovery rule prevents the statute of limitations from

running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another." *Martinez v. Cooper Hosp.-Univ. Med. Ctr.*, 163 N.J. 45, 52 (2000). The rule is an outgrowth of the principle that statutes of limitations are "not construed strictly, but rather flexibly, guided by equitable principles to achieve a just end." *R.A.C. v. P.J.S., Jr.,* 192 N.J. 81, 98, (2007). Importantly, New Jersey's discovery rule is different from many other states because it requires knowledge that the injury was the result of wrongful conduct. *Ayers*, 106 N.J.at 82, 525 ("Few states follow New Jersey's discovery rule that tolls the statute until the victim discovers both the injury and the facts suggesting that a third party may be responsible." [2]). So for example, a plaintiff who has been aware for many years that their injury was caused by a particular prescription drug, but who did not know until the limitations period expired that the choice to administer that drug may have been negligent, has a timely claim under New Jersey law. *Savage v. Old Bridge-Sayreville Med. Grp., P.A.*, 134 N.J. 241, 250 (1993).

Verizon does not even attempt to meet this standard. It makes no effort to

---

[2] This serves to distinguish Verizon's primary authority on the discovery rule: *Blanyar v. Genova Prod. Inc.*, 861 F.3d 426 (3d Cir. 2017). *Blanyar* involved a jurisdiction with an unusually "narrow approach" to the discovery rule which "places a greater burden" on plaintiffs than "most other jurisdictions." *Id.* at 433. It thus offers little guidance as to how this Court should apply New Jersey's very different approach here.

identify when a reasonable utility worker would have been aware that their need for medical monitoring was caused by Verizon's wrongful conduct, let alone to show that time would be outside of the limitations period. Likewise, it makes no effort to identify when a reasonable utility worker would be aware of their injury—their need for medical monitoring. Verizon has instead chosen to attack the well-founded concerns of utility workers who have been exposed to these cables as "irrational fears stoked by dubious journalism." ECF No. 18-1. But that is an implicit concession that reasonable utility workers would not have been aware of their need for medical monitoring or Verizon's responsibility for that injury prior to the journalism Verizon criticizes, which was published in 2023. Put simply, Verizon cannot denounce Plaintiffs' claims as irrational and stoked by recent journalism while also maintaining that they are so obvious they should have been brought years ago.

### III.     Plaintiffs State a Claim for Negligence and Properly Allege Their Entitlement to Medical Monitoring.

####     a. Verizon had a duty to anticipate the danger its misconduct would cause utility pole workers.

As a matter of basic principles, "[t]ort law imposes 'a duty to exercise reasonable care' on those whose conduct presents a risk of harm to others." *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 452–53 (2019) (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7). This can include a

"duty to anticipate [] danger to a third person's employees[.]" *Black v. Pub. Serv. Elec. & Gas Co.*, 56 N.J. 63, 76 (1970)). For example, *Black* held that a utility company could be held liable for hanging dangerous utility lines that caused injury to a construction company's employee. *Id. Black* also made clear that the possibility that the construction company might have also been negligent was irrelevant to whether the utility company owed a duty to the construction company's employee. *Id.* at 84. The law has not changed in the years since *Black* was decided: "[w]hether a duty exists to prevent harm is not controlled by whether another person also has a duty, even a greater duty, to prevent the same harm." *Kubert v. Best,* 432 N.J. Super. 495, 508–09 (App. Div. 2013).

*Black*'s holding is hardly surprising. Were it the case, as Verizon contends, that one has no duties to employees of a third-party, there would be no viable civil claim against a drunk driver who hits a construction worker on the highway. There would be no viable claim against a construction company whose shoddy workmanship caused an office building to collapse. And there would be no liability in any number of other run-of-the-mill tort suits where persons are injured on the job. While one can see why a large company would advocate for such a rule, it is clearly not the law.

Perhaps recognizing the weakness of its argument under New Jersey law, Verizon focuses on federal law—specifically OSHA regulations which impose

duties on employers, not third parties. Verizon argues these regulations preempt Plaintiffs' claims. This argument ignores 29 U.S.C. § 653(b)(4), OSHA's savings clause. There is a "solid consensus that 29 U.S.C. § 653(b)(4) operates to save state tort rules from preemption[.]" *Lindsey v. Caterpillar, Inc.*, 480 F.3d 202, 209 (3d Cir. 2007). *Lindsey*'s clear rule applies here. Plaintiffs' claims are not preempted.

### b. Plaintiffs have suffered an injury in the form of the present need for medical monitoring.

"The injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect [a latent] injury." *Paoli*, 916 F.2d at 850. A medical monitoring claim "seeks to recover the cost of periodic medical examinations intended to monitor plaintiffs' health and facilitate early diagnosis and treatment of disease caused by plaintiffs' exposure to toxic chemicals." *Ayers*, 106 N.J. at 599. This form of injury is not "speculative [compared to an impermissibly abstract injury] because the issue for the jury is the less conjectural question of whether the plaintiff needs medical surveillance." *Paoli*, 916 F.2d at 850. "Recognition of present claims for medical surveillance [] realistically addresses significant aspects of the present injuries sustained by toxic-tort plaintiffs, and serves as an added deterrent to polluters and others responsible for the wrongful use of toxic chemicals." *Mauro v. Raymark Indus., Inc.*, 116 N.J. 126, 145 (1989).

"[E]xisting symptoms or a medical diagnosis is not an element of a medical monitoring claim in New Jersey." *In re Paulsboro Derailment Cases (Paulsboro II)*,

2013 WL 5936991, at *3 (D.N.J. Nov. 4, 2013); *accord Lafferty v. Sherwin-Williams Co.*, 2018 WL 3993448, at *4 (D.N.J. Aug. 21, 2018) ("Damages for medical monitoring are appropriate when a plaintiff does not exhibit a physical injury but nevertheless requires medical testing as a proximate result of a defendant's negligent conduct."). Rather, to satisfy the injury requirement at the pleading stage, a plaintiff need only plead "direct exposure to harmful chemicals, risk of diseases connected to the exposure, and an increase in the chance of the onset of those diseases." *In re Paulsboro Derailment Cases (Paulsboro I)*, 2013 WL 5530050, at *5 (D.N.J. Oct. 4, 2013).

Plaintiffs have plausibly alleged exactly that. Plaintiffs have alleged direct exposure because "Defendants' aerial cables are attached to the same utility poles that carry other utility cables," meaning that utility pole workers must "interact with and touch the lead-sheathed cables, and inhale the air surrounding the lead-sheathed cables." ¶ 53. Plaintiffs have alleged risk of diseases connected to the exposure and an increase in the chance of the onset of those diseases *E.g.*, ¶ 5. That is enough to satisfy the injury requirement.

Verizon relies heavily on a statement in *Theer v. Philip Carey Co.*, 133 N.J. 610 (1993), that medical monitoring plaintiffs must demonstrate a "manifest injury." *Id.* at 627. But this statement must be read with the critical context that "[t]he injury in a medical monitoring claim is the cost of the medical care that will, one hopes,

detect [a latent] injury." *Paoli*, 916 F.2d at 850; *accord Ayers*, 106 N.J. at 565, .

Nothing about *Theer* suggests it intended to abrogate this basic rule, and post-*Theer*

cases like *Paulsboro I*, *Paulsboro II*, and *Lafferty* have not read it to do so.[3]

### c. Plaintiffs have alleged the elements required for medical monitoring relief.

Verizon formulaically attacks Plaintiffs' allegations about the necessity of

medical monitoring. But in doing so, it neither acknowledges Plaintiffs' allegations,

nor governing New Jersey law.

**Significant Exposure and Necessity of Medical Monitoring**: These

requirements for a medical monitoring claim are intertwined: "'[s]ignificant

exposure' [] refers to an exposure which, either by duration or harm, is sufficient to

cause a significantly increased risk, which in turn is sufficient to require a monitoring

regime different from that normally required in the absence of such an exposure."

*Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 846 (3d Cir. 1995).

Put differently, a significant exposure is one that creates a risk that warrants

---

[3] The decision in *In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 537 F. Supp. 3d 679 (D.N.J. 2021) is not to the contrary. The *Allergan* Court, dealing with a 50-state medical monitoring class action, laid out (1) a list of states which consider a subclinical change in the body a physical injury and (2) a list of states which require a physical injury for a medical monitoring claim. *Id.* at 760-765. It then dismissed claims for states that appeared on both lists. *Id.* New Jersey appeared on the first list, but not the second—meaning the *Allergan* Court recognized that New Jersey permits medical monitoring claims without a physical injury. *Id.* Consequently, the *Allergan* Court *declined* to dismiss a New Jersey state-specific medical monitoring subclass for lack of a physical injury. *Id.*

additional medical testing.

Plaintiffs plausibly plead that they have had sufficient exposure to lead to require a monitoring regime different from that required in the absence of lead exposure. Internal documents from Verizon's corporate predecessors reveal that the company has long known that "[a]ny time old lead cable is handled, lead dust is generated and introduced into the atmosphere." ¶ 25. There is an extensive body of evidence—from studies conducted by Defendants, leading independent medical researchers, and state regulators—that as a result of this people who work on utility poles often have dangerously elevated blood and bone lead levels. *E.g.*, ¶¶ 54, 55, 56, 60, 61, 62, 63, 64. Because of lead's propensity to "remain inert [in the bones] for many years and then release back into circulation at a later date" it is thus medically important for utility pole workers to have their bone and blood lead levels monitored—which is not needed for members of the general public. ¶¶ 44, 50, 75, 76. That is why Defendants pay for a medical monitoring program for their own employees. ¶ 74. That is also why lawmakers have called upon Verizon to provide medical monitoring to utility pole workers. ¶¶ 71-72.

Verizon makes no effort to explain why it maintains a medical monitoring program for its own employees if the risks of working with its abandoned lead cables are speculative and if medical monitoring for lead exposure is unnecessary. Nor does it seriously engage with Plaintiffs' other allegations, outlined above, showing the

appropriateness of medical monitoring. That is because it has no answer: such monitoring is both appropriate and necessary.

**Signature Injury Requirement**: Verizon also argues that New Jersey has limited medical monitoring claims to signature injuries. MTD at 22. This is simply wrong. *Ayers*, for example, involved medical monitoring for cancer, kidney damage, or liver damage—none of which were signature injuries. *Ayers*, 106 N.J. at 590. Verizon cites to *Theer* for this claim, but the portion of *Theer* it cites merely pointed out that a prior case (*Mauro*) was not analogous because it involved a signature injury. *Theer*, 133 N.J. at 626. The other cases Verizon cites[4] merely stand for the undisputed proposition that allegations about the need for medical monitoring cannot be conclusory. No New Jersey authority limits medical monitoring claims to signature injuries.

Even if there were a signature injury requirement, Plaintiffs would still have a viable claim. Lead poisoning is uniquely associated with lead. Verizon is wrong on both the law and the facts.

## IV. The SAC States a Claim For Negligence *Per Se* (Count 2).

As Verizon concedes, a statutory violation can support a claim for negligence *per se* "where the statute specifically incorporates a common law standard of care."

---

[4] *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 2013 WL 5655480, at *3 (E.D. Pa. Oct. 17, 2013); *Lafferty v. Sherwin-Williams Co.*, 2018 WL 3993448, at *4 (D.N.J. Aug. 21, 2018).

ECF 27-1 at 26; *see also Eaton v. Eaton*, 119 N.J. 628, 642 (1990) (same). RCRA codified common-law public nuisance. *See Middlesex Cnty. Bd. of Chosen Freeholders v. State of N.J., Dep't of Env't Prot.*, 645 F. Supp. 715, 723 (D.N.J. 1986) (RCRA is an "environmental statute codifying in certain respects common law nuisance theories"); *see also Fresh Air for the Eastside, Inc. v. Waste Management of New York, L.L.C.*, 405 F. Supp. 3d 408, 434-35 (W.D. N.Y. 2019) (A "citizen's RCRA endangerment claim pursuant to § 6972(a)(1)(B) is 'essentially a codification of the common law public nuisance'"). Common-law nuisance requires a finding that the conduct was unreasonable. *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 462 (D.N.J. 2009). Thus, Defendants' violations of RCRA and related New Jersey regulations are negligence *per se*.

Defendants argue that, to support a negligence *per se* claim, the statute "must be designed to protect a *specific* class of persons." ECF 27-1 at 27 (emphasis in original; internal quotations omitted). But RCRA was designed to protect a class of persons—namely, those citizens that may be at risk of "an imminent and substantial endangerment" caused by the defendants' improper disposal of solid or hazardous waste—that includes each of the individual Plaintiffs. 42 U.S.C. § 6972(a)(1)(B); *see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005) (affirming injunction issued by District of New Jersey and stating that RCRA "endangerment is substantial if there is some reasonable cause for concern that

someone or something may be exposed to a risk of harm"). In that way, the "class" of persons protected by RCRA (those endangered by improper disposal of waste) is similar to the "class" of persons protected by New Jersey's traffic laws (those endangered by reckless driving), which the New Jersey Supreme Court highlighted in *Eaton* as an example of statutes that can base negligence *per se*. 119 N.J. at 643. Not surprisingly, then, courts have held that negligence *per se* claims can be based on RCRA violations. For example, in *Bernbach v. Timex Corp.*, a plaintiff could proceed with negligence *per se* claims based on RCRA violations because "the legislative history of [these] statutes indicat[es] that they were intended to prevent the sorts of harms alleged from befalling the neighbors of hazardous waste sites." 989 F. Supp. 403, 408 (D. Conn. 1996).[5]

Verizon argues that Plaintiffs' negligence *per se* claim should be dismissed for failure to provide pre-suit notice to federal and state regulators. ECF 27-1 at 25. But there is no pre-suit notice requirement for a negligence *per se* claim under New Jersey law. Defendants cite no authority suggesting otherwise. Putting that aside, RCRA dispenses with the 60- or 90-day pre-suit notice Verizon relies on where, as here, the violations relate to *hazardous* (rather than merely solid) waste. *See* ¶ 123

---

[5] *See also Lozar v. Birds Eye Foods, Inc.*, 678 F. Supp. 2d 589, 605 (W.D. Mich. 2009) (denying motion to dismiss negligence *per se* claim based on RCRA violations); *The Newark Grp. v. Dopaco, Inc.*, 2010 WL 3619457, at *7 (E.D. Cal. Sept. 13, 2010) (denying motion for summary judgment on property owner's negligence *per se* claim based on RCRA violations that polluted owner's property).

(alleging hazardous waste under RCRA); 42 U.S. Code § 6972(b)(1)-(2) (stating that citizen suits "may be brought immediately after such notification in the case of … a violation of subchapter III [relating to hazardous waste]"); *Nuclear Watch New Mexico v. United States Dep't of Energy*, 2018 WL 3405256, at *8 (D.N.M. July 12, 2018) ("Essentially, Congress put aside notice requirements when plaintiffs allege violations of RCRA that involve presence of or mishandling of hazardous waste.").

Defendants also argue that medical monitoring "is a form of compensatory relief" and thus "unavailable under RCRA." ECF 27-1 at 25-26. This argument fails for two reasons. First, courts have rejected the argument that plaintiffs cannot recover compensatory damages in a negligence case based on conduct that also violates RCRA. *Nutrasweet Co. v. X-L Eng'g Corp.*, 926 F. Supp. 767, 771 (N.D. Ill. 1996). Second, and in any event, the relief Plaintiffs are seeking (abatement and a medical monitoring trust fund) is *equitable*, not "compensatory." *See Ayers*, 106 N.J. at 608 ("[T]he use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases . . . is a highly appropriate exercise of the Court's *equitable* power") (emphasis added).[6]

---

[6] Citing to *Mauro*, Defendants argue that "medical monitoring … is a form of compensatory relief under New Jersey law." ECF 27-1 at 26. *Mauro*, however, does not support Defendants' characterization. Indeed, the portion of *Mauro* Defendants cite is largely limited to block quotes of the New Jersey Supreme Court's decision in *Ayers*, which in turn squarely held that establishment of a medical monitoring trust fund is an "exercise of the Court's equitable power." *Mauro*, 116 N.J. at 136–37. (quoting *Ayers*); *Ayers*, 106 N.J. at 606, (stating that a medical monitoring trust

Finally, contrary to Verizon's arguments (ECF 27-1 at 28-29), the SAC pleads plausible RCRA violations. The SAC alleges that the lead Defendants abandoned is solid and hazardous waste under RCRA. *E.g.*, ¶ 101, 123. Under RCRA, it is illegal to contribute to "the past or present handling, storage, … or disposal of any solid or hazardous waste which *may* present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). The SAC details the toxic lead covering Defendants' cables, testing showing that lead from Defendants' cables has run off into the surrounding environment, and the various ways Defendants failed to comply with RCRA. ¶¶ 20-32; 119-125. Those allegations are more than sufficient to show that the lead from Defendants' cables *may* present and imminent and substantial endangerment to health or the environment, and thus that Defendants' conduct violated RCRA. *See Interfaith Cmty. Org*, 399 F.3d at 258 (affirming injunctive relief under RCRA and stating that "[b]ecause the operative word is 'may,' however, the plaintiffs must only show that there is a potential for an imminent threat of serious harm ... as an endangerment is substantial if it is 'serious' ... to the environment or health); *Lozar*, 678 F. Supp. 2d at 605 (plaintiffs adequately stated a negligence *per se* claim based on RCRA violations where "it is obvious from

---

fund is equitable relief). For this same reason, Defendants' cases discussing the availability of *compensatory* damages under RCRA—*i.e.*, *In re E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 2015 WL 4092866, at *23 (S.D. Ohio July 6, 2015) (cited at ECF 27-1 at 26)—are inapposite.

the second amended complaint that the plaintiffs are alleging that [the defendant] violated RCRA by improperly treating, storing and/or disposing of several substances … which arguably qualify as hazardous wastes").

According to Verizon, Plaintiffs do not plead that the danger is "imminent and substantial" because the SAC "allege[s] facts pertaining to a single New Jersey site." ECF 27-1 at 28. That is not accurate. The SAC alleges that Defendants' control a sprawling network of lead-sheathed cables that stretches across New Jersey. ¶¶ 20-21. In New Jersey alone, these cables hang near at least 64 schools and 350 bus stops and run down the bottom of the Passaic River. ¶ 26. Testing by independent laboratories shows that lead from Defendants' cables is polluting the surrounding environment and causing significant health risks to many individuals. ¶ 28. True, the SAC specifically details the results of testing at only three particular sites, and only one of those is in New Jersey. ¶¶ 29-31. But the testing at those sites gives rise to a plausible inference that the results would be similar across Defendants' entire network of similar cables. And even putting that aside, there is no requirement that Defendant allege *any* testing, or specifically quantify the levels of lead, at the pleading stage. *Lozar*, 678 F. Supp. 2d at 605 (rejecting the argument plaintiffs must plead testing or specifically quantify the amount of arsenic at issue). And the Third Circuit has held that whether a particular waste constitutes an "imminent and substantial" danger is a fact-intensive question inappropriate for resolution on a

motion to dismiss. *Interfaith Cmty. Org.*, 399 F.3d at 271 ("The determination of whether waste may present an imminent and substantial endangerment is heavily fact intensive, typically relying on expert testimony and expert studies interpreted at trial by experts.") (Ambro, J., concurring).

## V.    The SAC States A Claim for Public Nuisance (Count 3).

Under New Jersey law, a claim for public nuisance requires: "(1) an unreasonable interference and (2) a right common to the general public." *Rowe*, 262 F.R.D. at 462. New Jersey has adopted the Restatement (Second) of Torts for its "concepts of public nuisance." *In re Lead Paint Litig.,* 191 N.J. 405, 424(2007). The Restatement defines a public nuisance as an "unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1). One right common to the general public is "the right to an uncontaminated environment." *Jersey City Redevelopment Authority v. PPG Industries*, 655 F.Supp. 1257, 1265-1266 (D.N.J. 1987).[7] "Circumstances that may sustain a holding that an interference with a public right is unreasonable include ... [w]hether the conduct involves a significant interference with the public health, the public safety, the public peace,

---

[7] *See also Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 394 (D.N.J. 2021) (interference with public right where chemicals dumped in environment that ends up in water supply). *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 462-63 (D.N.J. 2009) (municipal water contamination); *Corradetti v. Sanitary Landfill, Inc.*, 912 F. Supp. 2d 156, 162 (D.N.J. 2012) (similar); *cf. City of Newark v. City of New York*, 2021 WL 3174983, at *5 (D.N.J. Mar. 30, 2021) (interfering with welfare of city).

the public comfort or the public convenience[.]" Restatement (Second) of Torts § 821B(2).

Here, Defendants abandoned a sprawling network of lead-sheathed cables across the state of New Jersey. ¶ 20. Far from being limited to a "restricted workspace" (as Defendants assert without basis in their brief, ECF 27-1 at 30), the cables are located in many public spaces, including near at least 64 schools and more than 350 bus stops, above driveways and sidewalks where families live and play, and down the bottom of the Passaic River. ¶¶ 26, 29. The lead on the cables has degraded, taken on a dust-like quality, and leached off the cables with the rainwater into the surrounding environments, causing people who make physical contact with the cables, or the water and soil surrounding them, to be exposed to toxic lead. ¶¶ 22-23, 27-28, 52, 104. Because there is no level of lead exposure that is known to be without harmful effects, Defendants' conduct has unreasonably interfered with the public right to an uncontaminated environment. ¶¶ 8, 38.

Defendants argue that Plaintiffs cannot show a "special injury." ECF 27-1 at 30-31. But there is no "special injury" requirement for nuisance claims seeking *equitable* relief, as Plaintiffs' claims do here. *Severa*, 524 F. Supp. 3d at 395 ("A plaintiff must prove a special injury to be awarded money damages on a public nuisance claim, but the special injury requirement is not necessary when the requested relief is to enjoin or abate the public nuisance."). Putting that aside, the

SAC pleads a "special injury." According to Verizon, "special injury" requires harm of a "different kind" to Plaintiffs, and, since "lead exposure poses health risks to everyone," and Plaintiffs are merely at a "*uniquely high* risk" relative to the general public, they cannot show a "special injury." ECF 27-1 at 30-31 (emphasis in original). Defendants' own authority—the Restatement (Second) of Torts— undermines their point. According to the Restatement:

> Difference in degree of interference cannot, however, be entirely disregarded in determining whether there has been difference in kind. Normally there may be no difference in the kind of interference with one who travels a road once a week and one who travels it every day. *But if the plaintiff traverses the road a dozen times a day he nearly always has some special reason to do so, and that reason will almost invariably be based upon some special interest of his own, not common to the community.*

Restatement (Second) of Torts § 821C comment c (emphasis added). Like the dozen-time-a-day driver described in the Restatement, utility workers encounter Defendants' cables *far* more frequently than members of the general public. That is because they have a special reason to do so—namely, their occupations and livelihoods—that is not common to the community. Utility workers' inability to perform their jobs without exposing themselves to toxic lead is an injury different in kind from that of other members of the public. *See Colon v. Tedesco*, 125 N.J. Super. 446, 448 (Law Div. 1973) (migrant laborers suffered special injury due to unsanitary conditions at labor camp); *Mayor & Council of Borough of Rockaway v. Klockner*

*& Klockner*, 811 F. Supp. 1039, 1057 (D.N.J. 1993) ("[I]njury to a business operation as a result of pollution may constitute special injury."); Restatement (Second) of Torts § 821C, comment h (1965) (contractor who loses the benefits of a particular contract or is put to an additional expense in performing it can recover for a public nuisance).

## VI.    The Court Should Not Dismiss the Class Allegations.

Verizon makes an extraordinary claim in its brief: that medical monitoring cases are categorically unsuitable for class treatment. MTD at 33. That is wrong. Medical monitoring classes are frequently certified, both in this District and elsewhere, where a defendant has engaged in a common course of conduct that causes a population of people to have a shared need for medical monitoring. *E.g.*, *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2023 WL 1818922, at *37 (D.N.J. Feb. 8, 2023) (certifying medical monitoring class action based on exposure to carcinogen in certain prescription drugs); *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 424 (3d Cir. 2016) (affirming certification of class action with medical monitoring component). That is because, in such circumstances, every element of a medical monitoring claim can be proven on a class-wide basis. *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 29 (D. Mass. 2010). Here, Verizon engaged in a common course of conduct (abandoning toxic lead cables) which has caused a population of people (utility pole workers) to have

a shared need for medical monitoring (to evaluate, *inter alia*, bone lead levels). Such claims are suitable for class treatment. That said, the Court need not even consider Verizon's challenge, since it is both incomplete and premature.

### a.    Verizon does not challenge Plaintiffs' "abatement" remedy.

Plaintiffs seek two forms of relief in this suit. The first is abatement. The second is medical monitoring. Verizon's motion addresses only medical monitoring and ignores abatement. But even if Verizon's arguments as to medical monitoring were justified (which they are not), Plaintiffs' class claims for abatement would still provide an independent ground for class treatment.

Abatement is a "classic example" of injunctive relief appropriate for class treatment. *Tull v. United States*, 481 U.S. 412, 423 (1987). Because of this, class claims seeking abatement of lead have consistently been certified under Rule 23(b)(2). *E.g.*, *Collier v. Montgomery Cnty. Hous. Auth.*, 192 F.R.D. 176, 184 (E.D. Pa. 2000) (certifying (b)(2) class seeking abatement of lead in public housing); *Elliott v. Chicago Hous. Auth.*, 2000 WL 263730, at *14 (N.D. Ill. Feb. 28, 2000) (same); *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 559 (S.D.N.Y. 1995) (same); *Hurt v. Philadelphia Hous. Auth.*, 151 F.R.D. 555, 560 (E.D. Pa. 1993) (same). Courts have likewise certified claims seeking abatement of other environmental hazards under (b)(2). *E.g.*, *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 457 (D.N.J. 2009).

**b.    It is premature to decide issues related to class certification.**

Courts in this District routinely decline to consider motions to strike class allegations at the pleading stage because the merits of class certification should be considered on a developed evidentiary record, after a plaintiff has had the opportunity to engage in discovery. *E.g.*, *In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 537 F. Supp. 3d 679, 752 (D.N.J. 2021) (rejecting challenge to medical monitoring class action as premature). "Normally, a putative class representative is afforded an opportunity to engage in discovery before testing the merits of his class claims." *McPeak v. S-L Distribution Co.*, 2014 WL 4388562, at *7 (D.N.J. Sept. 5, 2014). "[T]he usual practice favoring pre-certification discovery derives from the fundamental premise of Fed. R. Civ. P. 12, which is that claims, including class claims, should not be dismissed on the pleadings unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allergan*, 537 F. Supp. 3d at 752. Because of this, "numerous cases in this District have emphatically denied requests to strike class allegations at the motion to dismiss stage as procedurally premature." *Neuss v. Rubi Rose, LLC*, 2017 WL 2367056, at *10 (D.N.J. May 31, 2017); *see also* 3 Newberg on Class Actions § 7:22 (5th ed.) ("When a defendant moves to defeat certification prior to the end of discovery, many courts simply deny the motion outright on the grounds that the plaintiff is entitled to discovery on class certification

issues."). It is only in exceptional circumstances—where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"—that class claims should be struck at the pleading stage. *Allergan*, 537 F. Supp. 3d at 752; *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93 n. 30 (3d Cir. 2011), *opinion reinstated in relevant part after* en banc *review*, 2012 WL 2052685 (3d Cir. Apr. 17, 2012). Verizon has not met (and cannot meet) that standard.

Verizon pays only lip service to this demanding standard. Much of its brief is spent speculating about things that *might* come up in discovery which *might* raise individualized issues—like the possibility that some "putative class member[s] [have] collectively bargained for additional safety measures" or the possibility that a given class member's "employer or any union [may be] already providing lead screening or other medical services[.]" MTD at 36. Verizon likewise asks the Court to draw inferences against Plaintiffs—most prominently, the (unsupported) inference that the presence of trace amounts of lead in some consumer products means that class members may have needed monitoring for lead exposure even before exposure to Verizon's lead cables. MTD at 33-35. But it is Verizon's burden here to show that it is "beyond doubt that [prior to taking *any* discovery] the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allergan*, 537 F. Supp. 3d at 752. That burden is hardly satisfied by mere speculation

33

that discovery might reveal individualized issues. Thus, the Court should deny the motion to strike as premature.

### c.    This case is suitable for class treatment.

Should the Court reach the merits of Verizon's motion to strike (which for the reasons discussed above, it need not at this early stage), Verizon's motion to strike fails on the merits and should be denied. Verizon eschews a prong-by-prong analysis of Rule 23. But a prong-by-prong examination of Plaintiffs' claims under the Rule shows that Plaintiffs have plead more than enough to survive the pleading stage.

### 1.  The proposed class satisfies each 23(a) requirement.

**Numerosity**: "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the [numerosity] prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). There are "thousands" of affected utility workers in the putative class. ¶ 1. Numerosity is met.

**Commonality**: "[T]he focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant's conduct was common as to all of the class members[.]" *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). "The threshold for commonality under Rule 23(a)(2) is not high" and may be satisfied by a single common issue. *Block v. RBS Citizens, Nat'l Ass'n, Inc.*, 2016 WL 8201853, at *3 (D.N.J. Dec. 12, 2016); *accord In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d at 427 ("We have

acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable.") Here, Plaintiffs have alleged Verizon engaged in a common course of conduct (abandoning dangerous lead cables on utility poles) that caused (and causes) class members to be exposed to lead. This raises common questions about whether Verizon's abandonment of those cables was lawful, whether persons who work in close proximity to those cables are exposed to dangerous levels of lead, and whether abatement and medical monitoring are warranted as remedies. Commonality is met.

**Typicality**: "The typicality inquiry centers on whether the interests of the named plaintiffs align with the interests of the absent members." *Stewart*, 275 F.3d at 227. "The Third Circuit has set a 'low threshold' for typicality, such that 'even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct.'" *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12, 49 (E.D. Pa. 2019), *aff'd*, 967 F.3d 264 (3d Cir. 2020) (quoting *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d at 428). Here, Plaintiffs' claims arise from the same course of conduct, and each brings the same claims as the putative class. Typicality is met.

Verizon raises three arguments against typicality. First, it argues that the

Plaintiffs are atypical because they expressly disclaim personal injury damages in this suit, reserving the right to pursue the same in future litigation. MTD at 38. This, Verizon argues, is impermissible claim-splitting. *Id.* This argument has been flatly rejected. Both the New Jersey Supreme Court and the Third Circuit have held that it is not claim-splitting to bring a future action for personal injury damages after having brought a prior suit for medical monitoring. *Ayers*, 106 N.J. at 582-583; *Paoli*, 916 F.2d at 851 n.24.

Second, Verizon argues that, because Mr. Bostard is retired, his claims for injunctive relief are not typical of the rest of the class. But Verizon does not (and cannot) explain how this creates an impermissible conflict between his interests and those of the putative class. Without such a conflict, a mere factual difference, such as Mr. Bostard's retirement, is not enough to defeat typicality.

Third, Verizon argues that the fact Plaintiffs rely in part on the doctrine of fraudulent concealment and the discovery rule means that the class representatives' claims are necessarily atypical. But neither Plaintiffs' nor Verizon's statute of limitations arguments depend in any way on individualized inquiries—both are based on objective facts, common to the class, that in Verizon's view make the claims untimely and that Plaintiffs believe show the claims are timely. Far from undermining the basis for Plaintiffs' class claims, the statute of limitations issues in this case, instead, demonstrate the appropriateness of class treatment. *In re*

*Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (affirming class certification where fraudulent concealment could be shown through common proof).

**Adequacy**: The adequacy prong of Rule 23(a), like typicality, asks whether conflicts exist between Plaintiffs, class counsel, and the class. *Block*, 2016 WL 8201853 at *3. Verizon's arguments regarding adequacy mirror its arguments regarding typicality and are meritless for the same reasons. Adequacy is met.

### 2. The proposed class satisfies the requirements of 23(b).

After evaluating the 23(a) prongs, the Court should evaluate "whether the class meets the requirements of one of three categories of class actions in Rule 23(b)." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d at 426. Two of those categories are relevant here: 23(b)(2) and 23(b)(3).

**Rule 23(b)(2)**: A court may certify a class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Certification is appropriate "when a single, indivisible remedy would provide relief to each class member." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). "[T]his requirement is almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). "[W]hen a class seeks an indivisible injunction benefiting all its members at once, . . . [p]redominance and

superiority are self-evident." *Dukes*, 564 U.S. at 362–63.

First, as discussed above, abatement is a "classic example" of injunctive relief, *Tull*, 481 U.S. at 423, and because Plaintiffs' claims seek the classic injunctive remedy of abatement on behalf of a class that would uniformly benefit from such abatement, they are suitable for certification under (b)(2).

Second, "[c]ourts are divided over whether Rule 23(b)(2) or Rule 23(b)(3) is the appropriate vehicle for certifying a mass tort class for medical monitoring." *Manual for Complex Litigation* § 22.74 (4th ed. 2004). The divide reflects differing understandings of whether medical monitoring class actions seek a group-wide form of relief or aggregated individual relief. Courts which have certified such cases under (b)(2) have done so because "[f]rom the perspective of a medical monitoring regime, each plaintiff stands in the same position, making this case entirely appropriate for group-wide, rather than individual, relief." *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 7 (D. Mass. 2010); *accord Sullivan v. Saint-Gobain Performance Plastics Corp.*, 2019 WL 8272995, at *15 (D. Vt. Aug. 23, 2019). "Each individual class member may receive different sized 'awards' in the sense that the care required for each person may be different based on physician opinion and individual medical factors, but those variances have no effect on the order of relief as a whole." *Baker v. Sorin Group Deutschland GMBH*, 2017 WL11899154 at *9 (M. D. Pa Oct. 23, 2017).

Verizon argues that the Third Circuit's decision in *Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) necessarily means that medical monitoring class actions are unsuitable for class treatment for lack of cohesion. But "*Barnes* involved numerous defendants who, in turn, manufactured hundreds of brands of cigarettes, many of which contained different ingredients at different times." *In re Diet Drugs Prod. Liab. Litig.*, 1999 WL 673066, at *12 (E.D. Pa. Aug. 26, 1999). "Plaintiffs asserted that the levels of nicotine and other 'toxic substances' were altered to induce addiction, which they claimed caused their exposure to the tobacco products." *Id.* "Thus, nicotine addiction and levels of nicotine in cigarettes constituted individual issues which destroyed cohesion in the class." *Id.* The *In re Diet Drugs* Court thus correctly recognized that *Barnes* was no obstacle to a properly cohesive medical monitoring class action where a defendant has engaged in a common course of conduct that causes a population of people to have a shared need for medical monitoring.[8] *Id.* Other district courts in the Third Circuit have also recognized that

---

[8] Verizon's other primary authorities are no more on point. In *Gates v. Rohn and Haas Co.*, 655 F.3d 255 (3d Cir. 2011), the plaintiff sought to certify a class based on only hypothetical exposure data, without making any further showing that any substantial portion of the class met the conditions outlined in the hypothetical data. *Id.* at 266. Here, Verizon is asking this Court to strike the class allegations well before any expert testimony has been offered by either side. Likewise, *Lafferty v. Sherwin-Williams Co.*, 2018 WL 3993448, at *6 (D.N.J. Aug. 21, 2018) is distinguishable it involved a medical monitoring class action based on pollution from a paint factory that sought to ignore the obvious reality that people who lived next to the paint factory would be differently situated from people who lived miles away from the paint factory. *Id.* Indeed, plaintiffs' theory in that case was so

*Barnes* is not a sweeping rejection of (b)(2) certification of medical monitoring class actions, but is rooted in its particular facts. *E.g.*, *Baker*, 2017 WL11899154 at *30.

This case is wholly dissimilar to *Barnes*. Here, only Verizon and its subsidiary are Defendants. There are not hundreds of different kinds of items that caused the injury, but one—Verizon's dangerous abandoned lead cables. Unlike in *Barnes*, only one ingredient in those cables is relevant—the lead sheathing. And the proposed class is far narrower than the one proposed in *Barnes*—utility workers, rather than smokers. This class is cohesive in ways that the class in *Barnes* simply was not.

**Rule 23(b)(3)**: Alternatively, certification under Rule 23(b)(3) is appropriate. Despite Verizon's suggestion, the Third Circuit has affirmed the certification of a class action with a medical monitoring component under (b)(3). *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 424 (3d Cir. 2016). Likewise, district courts within the Third Circuit and beyond have certified medical monitoring claims under (b)(3) where a defendant has engaged in a common course of conduct that causes a population of people to have a shared need for medical monitoring. *E.g.*, *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2023 WL 1818922, at *37 (D.N.J. Feb. 8, 2023). Each of the elements of Plaintiffs' claims are susceptible to class-wide proof. Verizon's motion to strike should be denied.

---

indeterminate that it was a mystery to the Court how far away from the paint factory the class was supposed to stretch. *Id.* Such an ill-defined pleading bears no resemblance to this case.

Dated: June 17, 2024

Respectfully submitted,

/s/ Christopher L. Ayers
Christopher L. Ayers
Christopher A. Seeger
David R. Buchanan
Nigel P. Halliday
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
cayers@seegerweiss.com
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
nhalliday@seegerweiss.com

Eric S. Dwoskin
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

Nicholas F. Wasdin
DWOSKIN WASDIN LLP
110 N. Wacker Dr.
Chicago, IL 60606
Tel.: (312) 343-5361
nwasdin@dwowas.com
*Attorneys for Plaintiffs*