# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK TIGER, | ) |
| Plaintiff, | ) 2:23-cv-1618 |
| v. | ) |
| VERIZON COMMUNICATIONS INC.; and VERIZON PENNSYLVANIA LLC, | ) |
| Defendants. | ) |

## OPINION

Plaintiff Mark Tiger brings a class action against Defendants Verizon Communications Inc. and Verizon Pennsylvania LLC,[1] alleging that Verizon's failure to properly dispose of its toxic lead-sheathed telecommunications cables has harmed utility pole workers who were occupationally exposed to them. Verizon moves to dismiss Mr. Tiger's first amended complaint for lack of subject-matter jurisdiction and for failure to state a claim. After careful consideration, the Court will grant Verizon's motion because Mr. Tiger has not established that he has Article III standing.

## BACKGROUND

From 2019 to at least the date of the first amended complaint, February 2, 2024, Mr. Tiger worked as a utility pole worker—first for Figure 8 Communications from 2019 to 2020, then for Duda Cable Construction from 2020 onwards.[2] ECF 18, ¶ 15. In both roles, he regularly worked around and came into direct contact with Verizon's lead-sheathed cables. His clothes and body regularly rubbed against the cables as he climbed up the utility poles, and he had to grab onto the cables while he

---

[1] The Court refers to Defendants as "Verizon."

[2] After full briefing on Verizon's motion to dismiss, Mr. Tiger notified the Court that he left his job as a utility pole worker and accepted new employment in a different field. ECF 46, p. 1.

worked. *Id*. And then when he touched his face with his hands or used his hands to eat, he ingested and inhaled the lead. *Id*. He was routinely sick while he worked with the cables and experienced mood changes, headaches, nausea, fatigue, irritability, muscle and joint pain, and constipation, which are symptoms associated with lead exposure. *Id*. at ¶¶ 15, 35. Because he did not have insurance, he did not see a doctor. *Id*. at ¶ 15.

In his first amended complaint, Mr. Tiger brings claims for negligence, negligence per se, and public nuisance. He seeks class certification under Federal Rule of Civil Procedure 23 for all utility pole workers who were occupationally exposed to Verizon's lead-sheathed cables in Pennsylvania.[3]

He asks for a Court-supervised, Verizon-funded medical-monitoring program to "facilitate the diagnoses and treatment . . . for the catastrophic health effects" of lead exposure described in the complaint, including "damage to the central nervous system, kidney problems, cardiovascular problems, reproductive problems, cancer," "gastrointestinal symptoms, bowel changes, lung disease, muscle weakness, thyroid issues, cramps, hyperactivity, learning problems, changes in behavior or personality, headaches, vomiting, fatigue, irritability, mood changes, anemia, abdominal pain, muscle and joint pain, constipation, trouble sleeping, trouble concentrating, memory problems, and numbness in feet or legs." *Id*. at ¶¶ 5, 33-35, 122.

He claims that he and the putative class members require medical monitoring because lead can be stored in the body for years or decades after exposure, so individuals exposed to lead may not develop symptoms until long after the exposure. *Id*. at ¶¶ 44, 74. Mr. Tiger also seeks abatement for the proper disposal of Verizon's cables in Pennsylvania. *Id*. at ¶ 10.

---

[3] The class would exclude (1) individuals whose sole exposure was while working as an employee for Verizon, (2) government entities, (3) any judge to whom this case is assigned and their immediate family, and (4) Mr. Tiger's and putative class members' counsel. *Id*. at ¶ 87.

Verizon's motion to dismiss Mr. Tiger's first amended complaint is now before the Court. ECF 22. Verizon argues that Mr. Tiger lacks standing; that his claims are untimely; that he fails to state a claim as a matter of law under each count; and that the class allegations should be struck at this stage. After Mr. Tiger notified the Court that he was no longer employed as a utility pole worker, Verizon also raised mootness grounds for dismissing Mr. Tiger's claims for injunctive relief. ECF 47. After full briefing, the Court heard oral argument on the motion, and the parties submitted supplemental briefs. ECF 48, ECF 51, ECF 55. For the reasons that follow, the Court finds that Mr. Tiger lacks standing to pursue his claims in federal court.

## DISCUSSION & ANALYSIS[4]

"Article III standing requires (i) an injury-in-fact; (ii) fairly traceable to the defendant's conduct; and (iii) capable and likely of being prevented or redressed through the exercise of traditional judicial powers." *Gulden v. Exxon Mobil Corp.*, 119 F.4th 299, 305 (3d Cir. 2024). "The plaintiff bears the burden of showing these three elements, and likewise must demonstrate standing separately for each form of relief sought." *Rd.-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 354 (3d Cir. 2024) (cleaned up).

---

[4] "A motion to dismiss for want of standing is properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (cleaned up). "A district court has to first determine, however, whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Id.* The Court construes Verizon's motion as a facial attack to jurisdiction. "[A] facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)," and so "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* at 358 (cleaned up).

Injury-in-fact is at issue in this case. An injury-in-fact must be "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* at 339 (cleaned up). For an injury to be concrete, it must be "real, and not abstract." *Id.* at 340 (cleaned up). This concreteness inquiry requires courts to "assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 & 434 (2021) (cleaned up) (finding that the "mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm").

"When a plaintiff seeks retrospective (backward-looking) relief in the form of money damages, they can establish standing through evidence of a past injury. But when a plaintiff seeks *prospective* (forward-looking) relief in the form of an injunction or a declaratory judgment, they must show that they are likely to suffer *future* injury." *Rd.-Con, Inc.*, 120 F.4th at 354 (cleaned up). "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435, 438 (finding that the alleged risk of future harm—the risk of dissemination of credit information to third parties—was too speculative to support Article III standing); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is ***certainly impending***, or there is a ***substantial risk*** that the harm will occur." (cleaned up) (emphasis added)).

Mr. Tiger advances several theories of injury-in-fact in this case—none of which, in the Court's view, sufficiently establish a concrete and actual or imminent injury for either medical monitoring or abatement. The Court addresses each alleged injury below.

**Past lead exposure**.  Mr. Tiger first argues that his exposure to Verizon's lead cables constitutes an injury-in-fact for medical monitoring, *e.g.*, he was "necessarily harmed" because he was exposed to lead and there is "no level of lead exposure that is known to be without harmful effects."  ECF 24, p. 15.

But an allegation of mere exposure to lead—even when accompanied by allegations of common ailments like "mood changes, headaches, nausea, fatigue, irritability, muscle and joint pain, and constipation," (ECF 18, ¶ 15)—is not enough.

To begin with, Mr. Tiger hasn't alleged the presence of *elevated* levels of lead in his body.  He has not taken any blood or bone testing to measure the amount of lead that is presently in his body.  This is problematic because, as indicated by the articles cited to in the amended complaint, everyone is exposed to lead, due to its prevalence in the environment.  *See* ECF 18, ¶¶ 26, 39, 52; Teresa Welsh, *Lead Found in 20% of Baby Food, Report Says*, CTR. DAILY TIMES (June 20, 2017) (quoting FDA statement: "Lead is in food because it is in the environment and lead cannot simply be removed from food . . . . Absent our ability to prevent lead from entering the food supply, the FDA's goal is to protect human health by ensuring that consumer exposure to lead is limited to the greatest extent feasible."); Susan Pulliam et al., *America is Wrapped in Miles of Toxic Lead Cables*, WALL ST. J. (July 9, 2023) ("The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes."; "The EPA's recommendations for the levels of lead it believes are generally safe in soil are lower for areas where children play, at 400 parts per million, and higher for other areas, at 1,200 parts per million."); Shalini Ramachandran et al., *'I Was Really Sick, And I Didn't Know From What'*, WALL ST. J. (July 14, 2023) (citing to Centers for Disease Control and Prevention statistic that the average blood-lead level for the U.S. population in 1988 was 2.8 micrograms per deciliter); Shalini Ramachandran et al., *What AT&T and Verizon Knew About Toxic Lead Cables*, WALL

ST. J. (July 12, 2023) (noting that the current blood-lead level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up is 3.5 micrograms per deciliter).

While Mr. Tiger alleges that there is no level of exposure to lead that is known to be without harmful effects, this is contradicted by his assertion that "[s]ometimes, individuals exposed to lead have no symptoms" (ECF 18, ¶ 49), as well as counsel's acknowledgment during oral argument that "[p]eople do from time to time come into contact with lead in a safe context[.]" ECF 52, 51:7-20. And the articles that Mr. Tiger cites in the amended complaint indicate that there are federal standards on what is considered an acceptable or generally safe level of lead.

Given the naturally occurring lead levels in the environment and in our bodies, and the fact that individuals exposed to lead may not develop any lead-related conditions or symptoms at all (ECF 18, ¶ 49), mere exposure to lead—and the mere presence of lead in one's body—isn't a concrete injury. *See Young v. Johnson & Johnson*, No. 11-4580, 2012 WL 1372286, at *3 (D.N.J. Apr. 19, 2012) (no injury-in-fact where plaintiff alleged defendant's product contained partially hydrogenated oils—which in his views were dangerous and unhealthy—and cited to various studies concerning the health dangers of consuming partially hydrogenated oils, because plaintiff never alleged that he himself suffered any adverse health consequences, and "apprehension about a possible future injury is insufficient to establish injury-in-fact"); *In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig.*, 831 F. Supp. 2d 507, 510-11 (D. Mass. 2011) (plaintiffs' claim of potential adverse health effects from lead in defendants' products too conjectural because no allegation that plaintiffs suffered injury from consuming defendants' products or that the particular amount of lead in the products was dangerous—let alone allegations as to the amount of lead in the product); *Koronthaly v. L'Oreal USA, Inc.*, No. 07-5588, 2008 WL 2938045, at *5 (D.N.J. July 29, 2008) (plaintiff's allegation that she was injured by mere exposure to

- 6 -

lead-containing lipstick and her increased risk of being poisoned by lead insufficient to constitute injury-in-fact), *aff'd*, 374 F. App'x 257, 259 (3d Cir. 2010) (plaintiff has only asserted a subjective allegation that "the trace amounts of lead in the lipsticks are unacceptable to her," which is not an injury-in-fact); *Riva v. Pepsico, Inc.*, 82 F. Supp. 3d 1045, 1053 (N.D. Cal. 2015) (plaintiffs did not establish that the "alleged risk of bronchioloalveolar cancer" for which they sought medical monitoring was both "credible and substantial" because "the inferences of increased risk of harm that [were] based on the record established by the amended complaint (and studies incorporated therein) [were] speculative").

Neither is Mr. Tiger's allegation of common ailments—"mood changes, headaches, nausea, fatigue, irritability, muscle and joint pain, and constipation" (ECF 18, ¶ 15)—sufficient to constitute a concrete injury for purposes of his medical-monitoring relief.[5] These ailments could *potentially* be related to lead exposure, but could also be associated with a range of other medical conditions independent of lead exposure. Mr. Tiger might have a better argument if he had asserted conditions or non-common symptoms that are unique to or at least more consistent with elevated levels of lead in his body. But, despite his allegations that lead exposure *can* cause certain "catastrophic" health issues, such as reduced kidney function, neurological problems, cardiovascular problems, and cancer, he has not alleged that he suffers from these ailments or that they are even imminent. And, from the complaint, the Court cannot tell the amount or extent of Mr. Tiger's exposure to lead, *e.g.*, whether, and the extent to which, the alleged exposure to Verizon's lead cables increased his risk of contracting an illness or condition, such that it posed an unacceptable risk to his health, and whether there is a dangerous amount of lead in his body. Simply put,

---

[5] As Mr. Tiger notes in the first amended complaint, he is not seeking personal injury damages in this case for his past symptoms. ECF 18, ¶ 122.

- 7 -

the Court requires more concrete confirmation that Mr. Tiger has suffered an injury—or is at imminent and substantial risk of suffering an illness—likely caused by exposure to lead.

Mr. Tiger raises essentially two main arguments in response—neither of which is persuasive. First, he cites to *Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011), for the proposition that exposure to a toxic substance in and of itself is an injury-in-fact for standing purposes. ECF 24, p. 15; ECF 52, 35:23-36:1. In *Reilly*, the Third Circuit—in holding that there was no injury in a data breach case where no misuse of data was alleged and that an increased risk of identity theft from the security breach was insufficient to confer standing—distinguished standing in data breach cases from standing in toxic tort cases. The Court stated, in dicta, that "exposure to a toxic substance causes injury; cells are damaged and a disease mechanism has been introduced. Hence, the damage has been done; we just cannot yet quantify how it will manifest itself." *Reilly*, 664 F.3d at 45 (cleaned up).

But there is an important distinction to be made here: unlike toxic chemicals where cells are damaged upon exposure, lead is a naturally occurring metal and commonly exists in low levels in our bodies. As corroborated by the articles cited to in the amended complaint, lead is everywhere—in paint, in gasoline, in pipes. The effects of exposure to lead are different from the effects of exposure to other toxins, as is the manifestation of harm from the exposure and the risk of developing a disease from the exposure.[6]

---

[6] To further elaborate on the distinction between lead and other toxins, consider *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978), to which Mr. Tiger cites. ECF 51, p. 4. In *Duke Power* (a decision that predates *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)), the Supreme Court found that "the emission of **non-natural radiation** into appellees' environment [from nuclear power plants] would [] seem a direct and present injury, given our generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences of even small emissions like those concededly emitted by nuclear power plants." 438 U.S. at 74 (emphasis added). The health risks posed by

Second, Mr. Tiger points out that he is seeking medical monitoring—the very purpose of which is to be preventative of future injuries. ECF 24, p. 16. But even a medical-monitoring claim requires something more presently concrete. In this regard, Judge Goodwin's analysis in *Sommerville v. Union Carbide Corp.*, No. 19-00878, 2024 WL 2139394 (S.D.W. Va. May 13, 2024), is informative.

In *Sommerville*, which was also a medical-monitoring claim, the plaintiff's alleged injury was premised on the increased risk of developing cancer as a result exposure to emissions of ethylene oxide, a known carcinogen. 2024 WL 2139394, at *7. The court found that a "speculative increase in risk" of disease didn't establish standing, and that "injury cannot be sufficiently imminent when there is no evidence that the named plaintiff or any individual in the proposed class will or is reasonably likely to develop cancer." *Id.* at *8. And "[f]or an injury to be concrete and real, rather than abstract, a plaintiff must prove that an increased risk is more than a mere possibility." *Id.* at *9. Likewise, Mr. Tiger's allegations of lead exposure, at most, raises the mere possibility of an increased risk of developing a disease. But the possibility of developing a disease in the future is not enough to confer standing.[7]

---

even small quantities of non-natural radiation into the surrounding air and water is patently different from the risks posed by lead.

[7] Apart from Mr. Tiger's failure to assert an injury-in-fact, redressability for a medical-monitoring claim also poses an issue. To the extent that the asserted injury is the presence of lead in his body, Mr. Tiger's requested remedy, medical monitoring, "can't do anything about the presence *per se* of [lead] in [his] blood[,]" in that it "would not eliminate the [lead] from his blood" or "prevent more [lead] from entering his blood in the future." *In re E.I. DuPont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. 22-0305, 2022 WL 4149090, at *5 (6th Cir. Sept. 9, 2022) (cleaned up). To the extent that the asserted injury is the increased likelihood of developing certain diseases, this "raises another apparent mismatch between injury and remedy." *Id.* at *6. As the Sixth Circuit reasoned in *In re E.I. DuPont de Nemours*, the whole reason a plaintiff seeks medical monitoring "is to determine *whether* he has an elevated risk of disease." *Id.* But if a plaintiff "claims to be sufficiently likely to develop a disease to have Article III standing," this would be at odds with the fact that the whole purpose of his

- 9 -

**Need to obtain medical testing**.  Next, Mr. Tiger argues that he has a present economic injury because he has a "present medical need" to "obtain testing to determine the extent of the damage caused by the exposure" and "receive going-forward surveillance to permit the earliest possible diagnosis and treatment of any lead-related conditions that manifest in the future."  ECF 24, p. 15.  In other words, because Mr. Tiger has been exposed to lead, he argues that "the injury is the cost of medical care made necessary to identify the damage and monitor [his] body for the onset and development of future conditions."  *Id.* at p. 16.

As Mr. Tiger's counsel seemed to acknowledge at oral argument, Mr. Tiger's framing of the economic injury here—a present need to obtain medical testing—is intertwined with the existence of a medical-monitoring claim under state law.  *See* ECF 52, 35:2-4 ("To force somebody to shell out that money beforehand essentially eliminates the viability of medical monitoring as a tort in federal court.").  But this conflates the standing inquiry with the underlying state-law claim.  *Sommerville*, 2024 WL 2139394, at *4 ("[F]or purposes of Article III justiciability, it is not dispositive that a state judiciary has recognized a cause of action in state courts.").

While "[t]he injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect that injury[,]" a present need to obtain medical testing doesn't transform into a present economic injury sufficient to confer standing.  *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 850 (3d Cir. 1990).  Because Mr. Tiger did not go to the doctor or incur any medical expenses, there can be no economic injury.[8]

---

seeking medical monitoring is to "tell him if he's at risk of developing a disease" because "he actually has no idea about his risk of future disease."  *Id.*

[8] Even if Mr. Tiger had pled that he had visited the doctor and incurred medical costs, that alone certainly wouldn't be enough to create an injury-in-fact.  Otherwise, a plaintiff who might simply be a hypochondriac could claim standing for the costs associated with repeated and unnecessary doctor visits.  There would have to be something more concrete required to establish the necessity of these expenses to

**Future lead exposure**.  Lastly, Mr. Tiger argues that he had standing to seek abatement because—at the time of the filing of the complaint—he was still employed as a utility worker, so future exposure to Verizon's cables would have caused additional harm.  ECF 24, pp. 17-18; ECF 51, pp. 3-5.  The Court finds that Mr. Tiger did not have standing to seek abatement when he filed the complaint.[9]  This is so for at least two reasons.

First, the alleged threat of future injury premised on continued exposure to lead faces the same issues that the Court discussed above in relation to Mr. Tiger's argument that mere exposure to lead constitutes an injury-in-fact.  Namely, even if Mr. Tiger continued to be exposed to lead, nothing in the complaint indicates that injury is imminent or that there is a substantial risk that the injury will occur, *e.g.*, that he "will or is reasonably likely to develop" a lead-related disease.  *Sommerville*, 2024 WL 2139394, at *8.  "Mere conjecture that something has the potential to be harmful is not enough." *Doss v. Gen. Mills, Inc.*, No. 18-61924, 2019 WL 7946028, at *3 (S.D. Fla. June 14, 2019) (finding that "[a]ny hypothetical health risks" from a probable carcinogen are "far too speculative to manufacture standing"), *aff'd*, 816 F. App'x 312 (11th Cir. 2020).

Even if the future injury is framed as an increased risk in developing a lead-related disease, what amount of exposure and what blood lead level is likely to manifest in disease?  *See id.*  Moreover, Mr. Tiger does not know whether and how much lead is in his body.  Given these unknowns, the alleged future injury is too conjectural.  *See McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 710 (9th Cir. 2020) ("[A]lthough the complaint alleges that there are serious health risks associated with

---

confer standing.  The Court, though, doesn't have to dive too much into the details on this, as Mr. Tiger alleges that he never even went to the doctor.

[9] As the Court grants Verizon's motion based on standing, the Court will not reach the mootness issue in this case.

- 11 -

the consumption of artificial trans fat, even in small quantities, we are not persuaded that [plaintiff] has plausibly alleged that her limited consumption of Pop Secret placed her at *substantial* risk of disease[,]" where the studies plaintiff cited to in her complaint associated serious health risks with greater levels of consumption); *Herrington v. Johnson & Johnson Consumer Cos.*, No. 09-1597, 2010 WL 3448531, at *3 (N.D. Cal. Sept. 1, 2010) (risk of harm to plaintiffs' children resulting from their exposure to carcinogenic baby bath products was not sufficiently imminent where they only alleged that the chemical ingredients in the products were probable carcinogens and that "scientists believe there is no safe level of exposure to a carcinogen," but did not plead that the amounts of the chemicals in the products have caused harm or create a credible or substantial risk of harm); *Kimca v. Sprout Foods, Inc.*, No. 21-12977, 2022 WL 1213488, at *8 (D.N.J. Apr. 25, 2022) (no injury where plaintiffs did not establish that the levels of heavy metals in the baby food products were unsafe).

Second, assuming that Mr. Tiger had continued to work as a utility worker, future lead exposure would have been conjectural. Because Mr. Tiger has brought this lawsuit, "it is common sense that [he is] now aware of the alleged risks associated with" Verizon's lead cables, and thus, the Court may assume that, in the future, he will take precautions in light of those known risks. *Kimca*, 2022 WL 1213488, at *10; *see also In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 292-93 (3d Cir. 2018) ("Because [plaintiff] makes clear in this very lawsuit that she is well aware of health risks associated with using [the product], we readily conclude that she is not likely to suffer future economic injury[,]" as plaintiff couldn't possibly be deceived again into buying the product without being aware of those same risks).

In sum, the amended complaint fails to plead any cognizable injury-in-fact. Mr. Tiger's theories of injury in the context of this specific case are too conjectural and speculative. So the complaint must be dismissed on standing grounds.

## CONCLUSION

Therefore, after careful consideration, it is hereby **ORDERED** that Verizon's motion to dismiss (ECF 22) for lack of subject-matter jurisdiction is **GRANTED**, and the complaint is hereby **DISMISSED WITHOUT PREJUDICE**.[10]  *See Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 896 (3d Cir. 2020). As the Court lacks subject-matter jurisdiction over the action, the remaining grounds for dismissal that Verizon raises in its motion to dismiss are hereby **DENIED WITHOUT PREJUDICE AS MOOT**. A separate order follows.

Date: February 7, 2025                                        BY THE COURT:

                                                              /s/ J. Nicholas Ranjan
                                                              United States District Judge

---

[10] Nothing in this opinion should be construed as a finding that Mr. Tiger lacks standing to bring any of his claims in state court. That issue, obviously, was not and could not be raised before this Court.